**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AUSTIN VINSON, derivatively on behalf of FIVE BELOW, INC., | CASE NO. |
| Plaintiff, | |
| v. | |
| JOEL ANDERSON, KENNETH BULL, THOMAS VELLIOS, KATHLEEN BARCLAY, KAREN BOWMAN, CATHERINE BUGGELN, MICHAEL DEVINE, DINESH LATHI, BERNARD KIM, RICHARD MARKEE, THOMAS RYAN, RONALD SARGENT, MIMI VAUGN, and ZUHAIRAH WASHINGTON | **JURY TRIAL DEMANDED** |
| Defendants, | |
| FIVE BELOW, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Austin Vinson ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Five Below, Inc. ("Five Below" or the "Company"), files this Shareholder Derivative Complaint against Defendants Joel Anderson, Kenneth Bull (collectively, the "Non-Director Defendants"), Thomas Vellios, Kathleen Barclay, Karen Bowman, Catherine Buggeln, Michael Devine, Dinesh Lathi, Bernard Kim, Richard Markee, Thomas Ryan, Ronald Sargent, Mimi Vaugn, and Zuhairah Washington (collectively, the "Director Defendants" and together with the Non-Director Defendants, the "Individual Defendants"), for breaches of their fiduciary duties as directors and/or officers of Five Below, unjust enrichment, and waste of corporate assets.

1

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Five Below, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit action filed in the U.S. District Court for the Eastern District of Pennsylvania captioned *In re Five Below, Inc. Securities Litigation*, Case No. 24-cv-3638 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action brought in the right, and for the benefit, of Five Below against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from November 30, 2022 through July 16, 2024 (the "Relevant Period") and have caused, and continue to cause, substantial harm to Five Below and its shareholders, including monetary losses and damages to Five Below's reputation and goodwill.

2. This complaint stems from the Individual Defendants repeatedly causing the Company to misrepresent Five Below's growth and financial success. The Individual Defendants engaged in fraudulent conduct by concealing critical information about: (1) the Company's ability to identify trending product, and then allocate and track those "trend-right" products in order to successfully provide sufficient volume to meet and drive customer demand; (2) its plans to successfully triple its number of stores by 2030 while doubling its sales by 2025 (its "Triple-

Double" initiative); and (3) the resulting decline in its sales and margins, which it instead misleadingly blamed on "shrink" – or shoplifting and theft.

3.      Founded in 2002 and headquartered in Philadelphia, Pennsylvania, Five Below, named for the typical price range of $1 to $5 for its products, markets itself as "a leading high-growth value retailer."

4.      Primarily targeting "teens, tweens, and beyond," the Company asserts that its customer-focused, experience-driven, and innovative retail approach, based on management's industry experience, has cultivated a loyal customer base with broad appeal across various age groups. Offering over 4,000 items in eight product "worlds" (Style, Room, Sports, Tech, Create, Party, Candy, and New & Now), Five Below emphasizes fast turnover to keep its assortment fresh and drive repeat visits by costumers.

5.      The Company claims its ability to identify and sell "trend-right" products, selected based on market trends, customer data, and product performance as a key strength – its "secret sauce."

6.      Despite misleading statements to the contrary during the Relevant Period, Five Below lacked the infrastructure necessary to reliably identify and source trend-right merchandise or track inventory to ensure adequate supply. Notwithstanding these deficiencies, the Company continued to tout the strength and progress of its Triple-Double plan while blaming declining performance on "societal" theft problems, rather than admitting that poor inventory management, product misalignment, and reckless expansion were driving its losses.

7.      Throughout the Relevant Period, the Company repeatedly promoted its identity as a trend-driven retailer in earnings calls, press releases, SEC filings, and investor conferences,

representing that it was agile and well-positioned to capitalize on consumer preferences, especially during key shopping seasons.

8.      Analysts largely accepted these claims, attributing the Company's growth potential to its touted trend-right merchandising strategy. Even in mid-2024, analysts continued to view Five Below's product mix and expansion favorably, reinforcing the Company's false narrative.

9.      In reality, Five Below consistently failed to identify or deliver products that matched consumer demand. Stores were overstocked with unsellable items while lacking high-demand goods, and the Company's inventory tracking systems were inadequate to monitor stock levels or manage distribution. These issues were widespread, persisted throughout the Relevant Period, and were confirmed by multiple former employees.

10.      When earnings began to decline, Five Below further misled investors by attributing results to shrink rather than disclosing its internal failures. On multiple earnings calls from mid-2023 through 2024, Officers including then-CEO Defendant Anderson and COO Defendant Bull claimed that results were being impacted by increased retail theft and insufficient prosecution in certain jurisdictions. The Company, however, never provided specific shrink data. Instead, it claimed to be implementing mitigation strategies while continuing to use shrink as a cover for poor merchandising and inventory management. Investors and analysts accepted these explanations, believing the Company's assurances that the issue was external and being addressed.

11.      At the same time, Individual Defendants promoted the Company's ambitious Triple-Double expansion plan while concealing its detrimental effects on operations. Defendant Anderson and CFO Kristy Chipman repeatedly expressed confidence in aggressive growth projections, touting hundreds of new store openings annually. These representations omitted that the expansion

was overambitious, diverted management's attention from inventory and operations, and diluted sales across overlapping stores.

12.    Former employees described chronic understaffing, product shortages, significant inventory delays, particularly for "Five Beyond" (higher-priced) merchandise, and the use of outdated products and signage to create an illusion of operational success. Despite internal concerns raised as early as 2021 about the feasibility of the Triple-Double plan, management ignored them, continuing to portray the initiative as achievable and beneficial.

13.    Between March and July 2024, the truth about Five Below's deteriorating performance began to emerge through a series of partial disclosures. On March 20, 2024, the Company reported disappointing earnings, citing shrink and underperforming new locations, causing a stock decline of over 15% ($32.18 per share).

14.    On June 5, 2024, Five Below reported further weak results, blaming inflation and consumer spending habits but also admitting outdated merchandise and an inability to sustain prior trends, prompting another 10.6% stock drop. On July 16, 2024, Anderson abruptly resigned as CEO. The Company disclosed a 5% year-over-year decline in comparable sales and forecasted an additional 6 – 7% decline, triggering a 25% share price drop ($25.57) to its lowest level since 2018. In the aftermath, Interim CEO Bull admitted that the Company had "lost our way," acknowledging that the Triple-Double plan had overextended the Company and diverted attention from its core merchandising. Executive Chairman Tom Vellios likewise conceded that the Company had lost focus on its core customers and still had a long road ahead to restore its trend-right execution.

15.    Altogether, these revelations erased more than $7 billion in market capitalization. In contrast, Anderson and Bull personally profited, selling over $9 million in stock at artificially

inflated prices and receiving more than $10 million in incentive compensation tied to the inflated share price.

16.    As a result of the foregoing, Five Below, its former Chief Executive Officer ("CEO") and its Chief Operating Officer ("COO") (and former Chief Financial Officer ("CFO")) have been named defendants in the Securities Action by investors who allege they were damaged when they purchased Five Below shares during the Relevant Period.

17.    The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. It will likely cost the Company millions of dollars going forward.

18.    On June 20, 2025, Plaintiff sent a letter to the Five Below Board of Directors (the "Board") demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors (the "Demand").[1]    On September 17, 2025, counsel for the Special Litigation Committee ("SLC") formed by the Board informed Plaintiff's counsel by email that "[t]he SLC has completed its investigation and has determined that it would not be in the best interests of the Company to pursue litigation or take other steps in response to the demand letters."[2]    As such, Plaintiff has not received a substantive response to the Demand and demand in this case was refused.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

---

[1] A true and complete copy of the Demand is attached hereto as Exhibit A.
[2] A true and complete copy of the SLC's response to Plaintiff's counsel is attached hereto as Exhibit B.

for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.142-9) promulgated thereunder by the SEC. Plaintiff's claims also implicate a federal question to the extent they relate to the allegations set forth in the Securities Class Action, which is premised on violations of the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

21.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts, omissions, transactions, and events giving rise to the claims asserted herein occurred in this District. Additionally, one or more of the Defendants resides in, maintains executive offices in, conducts business in, and/or caused harm that was felt within this District.

## PARTIES

### Plaintiff

22.    Plaintiff, Austin Vinson, has continuously been a shareholder of Five Below at all relevant times.

### Nominal Defendant

23.    Nominal Defendant Five Below is a Pennsylvania corporation with its principal executive offices located at 701 Market Street, Suite 200, Philadelphia, Pennsylvania.

24.    Five Below stock trades on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol "FIVE."

**Individual Defendants**

Defendant Anderson

25.     Defendant Joel Anderson ("Anderson") served as Five Below's CEO and President from 2015 until July 15, 2024.

26.     For fiscal year 2022, Anderson received a total of $7,026,551 in compensation from the Company. This included $1,211,538 in salary, $5,812,090 in stock awards, and $2,923 in all other compensation. For fiscal year 2023, Anderson received a total of $10,185,354 in compensation from the Company. This included $1,250,000 in salary, $7,576,450 in stock awards, $1,350,000 in non-equity incentive plan compensation, and $8,904 in all other compensation. For fiscal year 2024, Anderson received a total of $8,104,417 in compensation from the Company. This included $649,231 in salary, $7,445,076 in stock awards, and $10,110 in all other compensation.

27.     The Company's 2024 Proxy Statement stated the following about  Anderson:

**Joel D. Anderson.** Mr. Anderson, 59, has served as a director since February 2015, when he was appointed to serve as our President and Chief Executive Officer. Prior to becoming our President and Chief Executive Officer, Mr. Anderson was our President and Chief Operating Officer from July 2014 through January 2015. Prior to joining Five Below, Mr. Anderson served as President and Chief Executive Officer of Walmart.com from 2011 until 2014 and as the divisional Senior Vice President of the Northern Plains division of Walmart, Inc., a global retailer, from 2010 to 2011. Prior to joining Walmart, Mr. Anderson was President of the retail and direct business units for Lenox Group, Inc. and served in various executive positions at Toys "R" Us Inc. over a 14-year period. Mr. Anderson currently serves as a director of Sprouts Farmers Market where he serves on the audit and compensation committees. Mr. Anderson's experience in the retail industry as well as his position as our President and Chief Executive Officer led to the conclusion that he should serve as a director of Five Below.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Anderson executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|:---:|:---:|:---:|:---:|
| 12/2/2022 | 10,000 | $185.57 | $1,855,700 |
| 3/9/2023 | 2,390 | $199.53 | $476,877 |
| 3/16/2023 | 1,072 | $195.33 | $209,394 |
| 4/11/2023 | 13,653 | $218.97 | $2,989,597 |
| 3/7/2024 | 1,814 | $206.96 | $375,425 |
| 3/9/2024 | 1,642 | $204.82 | $336,314 |
| 3/21/2024 | 7,290 | $176.79 | $1,288,799 |
| **Total** | **37,861** | | **$7,532,106** |

29.     In total, before the fraud was revealed, Defendant Anderson sold 37,861 shares of Company stock based on inside information, receiving approximately $7,532,106 in proceeds. This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

Defendant Bull

30.     Defendant Kenneth Bull ("Bull") has served as the Company's Chief Operating Officer since March 2023. Prior to that position, Defendant Bull served as the Company's Chief Financial Officer and Treasurer from 2012 until July 2023.

31.     For fiscal year 2022, Defendant Bull received a total of $1,788.729 in compensation from the Company. This included $654,615 in salary, $1,107,013 in stock awards, and $27,101 in all other compensation. For fiscal year 2023, Defendant Bull received a total of $4,185,840 in compensation from the Company. This included $718,269 in salary, $2,914,186 in stock awards, $540,000 in non-equity incentive plan compensation, and $13,385 in all other compensation. For

fiscal year 2024, Defendant Bull received a total of $6,294,557 in compensation from the Company. This included $797,115 in salary, $5,081,605 in stock awards, $15,837 in all other compensation, and $400 in bonus.

32.    The Company's 2025 Proxy Statement stated the following about Bull:

**Kenneth R. Bull.** Mr. Bull, 62, has served [sic] our Chief Operating Officer since March 2023, having previously served as our Chief Financial Officer and Treasurer since 2012. From July 2024 to December 2024, Mr. Bull also served as our interim President and Chief Executive Officer. He joined the Company as Senior Vice President, Finance in 2005 and has also served as our Secretary. Previously, Mr. Bull was the Finance Director and Treasurer for Urban Outfitters, Inc., a specialty lifestyle merchandising retailer, from 1999 to 2003, and the Vice President, Finance and Controller for Asian American Partners d/b/a Eagle's Eye, a wholesaler and retailer of women's and children's better apparel from 1991 to 1999.

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Bull executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|:---:|:---:|:---:|:---:|
| 12/2/2022 | 7,000 | $182.40 | $1,276,800 |
| 3/7/2024 | 272 | $206.96 | $56,293 |
| 3/9/2024 | 256 | $204.82 | $52,434 |
| 3/21/2024 | 914 | $176.79 | $161,586 |
| **Total** | **8,442** | | **$1,547,113** |

34.    In total, before the fraud was revealed, Defendant Bull sold 8,442 shares of Company stock based on inside information, receiving approximately $1,547,113 in proceeds. This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

Defendant Vellios

35.     Defendant Thomas ("Vellios"), co-founder of Five Below, served as a member of the Company's Board from 2002 to until June 2025 and as Chairman of the Board from June 2018 until June 2025.

36.     As a non-employee director, Vellios received $500,194 and $498,455 in total compensation during FYs 2022 and 2023.

37.     The Company's 2024 Proxy stated the following about Vellios:

**Thomas G. Vellios.** Mr. Vellios, 69, is the co-founder of Five Below and has served as our Chairman since June 2018, our Executive Chairman from February 2015 until June 2018, and as one of our directors since our incorporation in 2002. Mr. Vellios previously served as our Chief Executive Officer from 2002 until January 31, 2015. Mr. Vellios also served as our President from 2005 until June 2014. Previously, Mr. Vellios served as President, Chief Executive Officer and a director of Zany Brainy, Inc. Prior to joining Zany Brainy, Mr. Vellios served as Senior Vice President, General Merchandise Manager at Caldor, a regional discount chain and a division of the May Company. Mr. Vellios' 25 plus years of experience in the specialty, department store and discount retail industry, his experience with the management, operations and finance of a retail business, and his knowledge of the Company as a founder led to the conclusion that he should serve as a director of Five Below.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Vellios executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|---|---|---|---|
| 12/2/2022 | 50,000 | $181.86 | $9,093,052 |
| 4/11/2023 | 20,000 | $219.15 | $4,383,000 |
| 1/23/2024 | 10,000 | $185.82 | $1,858,225 |
| **Total** | **80,000** | | **$15,334,277** |

39.     In total, before the fraud was revealed, Defendant Vellios sold 80,000 shares of Company stock based on inside information, receiving approximately $15,334,277 in proceeds.

This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

Defendant Barclay

40.     Defendant Kathleen Barclay ("Barclay") has served as a member of the Company's Board since 2015. She is a member of the Board's Nominating and Governance and Compensation Committees.

41.     As a non-employee director, Barclay received $269,942, $269,845, and $285,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

42.     The Company's 2025 Proxy stated the following about Barclay:

**Kathleen S. Barclay.** Ms. Barclay, 69, has served as a director since March 2015. Ms. Barclay served as the Senior Vice President of Human Resources for The Kroger Co., a $100 billion grocery supermarket company, from 2009 until her retirement in 2016. Prior to joining The Kroger Co., Ms. Barclay served in many leadership roles at General Motors Corporation, a multinational automotive corporation, from 1985 to 2010, including Vice President of Global Human Resources from 1998 to 2009. Ms. Barclay served as a director of Kontoor Brands from 2019 to 2023. Ms. Barclay's senior leadership experience with a large-scale, growing retailer led to the conclusion that she should serve as a director of Five Below.

43.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Barclay executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|---|---|---|---|
| 12/2/2022 | 3,319 | $187.10 | $620,985 |
| 3/30/2023 | 2,500 | $202.38 | $505,950 |
| **Total** | **5,819** | | **$1,126,935** |

44.     In total, before the fraud was revealed, Defendant Barclay sold 5,819 shares of Company stock based on inside information, receiving approximately $1,126,935 in proceeds. This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

Defendant Bowman

45.     Defendant Karen Bowman ("Bowman") has served as a member of the Company's Board since January 2024. She is a member of the Board's Audit Committee and Chair of the Nominating and Governance Committee.

46.     As a non-employee director, Bowman received $62,980 and $262,945 in total compensation during FYs 2023 and 2024 respectively.

47.     The Company's 2025 Proxy stated the following about Bowman:

**Karen Bowman.** Ms. Bowman, 61, has served as a director since January 2024. She was previously the Deloitte Global Boardroom and Executive Program Leader and the Deloitte US Vice Chairman and National Sector Leader for the Automotive Industry and the Transportation, Hospitality and Services Industry. She served as a member of the US Deloitte Board of Directors and as a member of the Board of Directors for Deloitte Consulting LLP. She was also the leader of the Deloitte US Business Transformation Integrated Market Offering. She has more than 30 years of professional and consulting experience across a broad range of industries, with specific focus on the consumer industry. She helps clients transform their businesses as well as align their people and business strategies. Ms. Bowman's senior leadership experience spanning diverse industries, with a keen focus on the consumer industry, led to the conclusion that she should serve as a director of Five Below.

Defendant Buggeln

48.     Defendant Catherine E. Buggeln served on the Company's Board from 2015 until 2022. She was a member of the Board's Audit and Nominating and Corporate Governance Committees.

13

49.     As a non-employee director, Buggeln received $249,942 in total compensation during FY 2022.

50.     The Company's 2023 Proxy stated the following about Buggeln:

**Catherine E. Buggeln.** Ms. Buggeln, 62, has served as a director since March 2015. Ms. Buggeln has been a consultant to various retailers since 2004. From 2012 to 2018, Ms. Buggeln provided advisory services to Irving Place Capital Management, L.P., a private equity firm focused on making equity investments in middle-market companies. Ms. Buggeln formerly served as the Senior Vice President of Strategic Planning and New Business Development at Coach, Inc., a leading marketer of modern classic American accessories, from 2001 to 2005. She currently serves as a director on the boards of two private equity owned companies, Noble Biomaterials, Inc. and Scoop Holdings (cabi). She also previously served as a director of The Timberland Company in 2011, the Vitamin Shoppe from 2009 to 2017, and Ascena Retail Group from 2004 to 2021. Ms. Buggeln's extensive experience in the retail industry, in both managerial and director roles, led to the conclusion that she should serve as a director of Five Below.

51.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Buggeln executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|---|---|---|---|
| 12/2/2022 | 2,253 | $218.04 | $491,240 |
| **Total** | **2,253** | | **$491,240** |

52.     In total, before the fraud was revealed, Defendant Buggeln sold 2,253 shares of Company stock based on inside information, receiving approximately $491,240 in proceeds. This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

<u>Defendant Devine</u>

53.    Defendant Michael F. Devine, III ("Devine") has served as a member of the Company's Board since 2013 and as Chairman of the Board since June 2025.

54.    As a non-employee director, Devine received a total of $276,796, $274,845 and $290,945 in FYs 2022, 2023, and 2024 respectively.

55.    The Company's 2025 Proxy stated the following about Devine:

**Michael F. Devine, III.** Mr. Devine, 66, has served as a director since March 2013. Mr. Devine is the former Executive Vice President and Chief Financial Officer of Coach, Inc. Mr. Devine served as Chief Financial Officer at Coach, Inc. since December 2001 and Executive Vice President and Chief Financial Officer since August 2007 until his retirement in August 2011. Mr. Devine currently serves as the Chairman of the Board of Deckers Outdoor Corporation, where he serves on the audit committee and compensation committee. Mr. Devine previously served as a director and member of the audit committee of both Express, Inc. and Nutrisystem, Inc. and as a director of Talbots and Sur La Table. Mr. Devine's extensive experience in the retail industry, as both an executive officer and director, led to the conclusion that he should serve as a director of Five Below.

<u>Defendant Lathi</u>

56.    Defendant Dinesh Lathi ("Lathi") has served as a member of the Company's Board since 2018. He is chair of the Board's Audit Committee and serves as a member of the Investment Committee.

57.    As a non-employee director, Lathi received a total of $268,816, $279,845 and $295,945 in FYs 2022, 2023, and 2024 respectively.

58.    The Company's 2025 Proxy stated the following about Lathi:

**Dinesh S. Lathi.** Mr. Lathi, 54, has served as a director since March 2018. Mr. Lathi is a Senior Operating Partner at Francisco Partners Consulting. He serves as Chairman of the Board of Interior Logic Group, the largest national provider of interior design solutions and installation of high-quality finishes for the building industry, a Director of MyFitnessPal, the leading global nutrition and food tracking app and Chairman of The Weather Company, the world's most accurate weather forecaster. He was Interim CEO of MyFitnessPal from June 2023 to January 2024 and the Interim CEO of Rugs USA from January 2022 to December 2022.

Previously, he served as President and Chief Executive Officer of Tailored Brands, Inc., a leading specialty retailer of men's suits and formalwear, from March 2019 to March 2021. He joined Tailored Brands' board of directors in March 2016, and served as its Non-Executive Chairman from April 2017 to August 2018, and its Executive Chairman from August 2018 to March 2019. In August 2020 Tailored Brands, Inc. filed for Chapter 11 bankruptcy protection and, under Mr. Lathi's leadership, emerged from such protection in December 2020. Previously, he was the Chief Executive Officer of One Kings Lane, a digital home decor shopping platform, from 2014 to 2016, where he also served as the Chief Operating Officer and Chief Financial Officer from 2011 to 2014. Prior to One Kings Lane, Mr. Lathi was a Vice President at eBay, a global online marketplace, where he managed several key areas, including Buyer & Seller Experience. Mr. Lathi's 20 plus years of leadership experience in the technology and consumer space led to the conclusion that he should serve as a director of Five Below.

Defendant Kim

59.    Defendant Bernard Kim ("Kim") served on the Company's Board from 2022 until 2024. He was a member of the Board's Nominating and Corporate Governance Committee.

60.    As a non-employee director, Kim received $218,283, $249,845, and $262,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

61.    The Company's 2025 Proxy stated the following about Kim:

**Bernard Kim.** Mr. Kim, 47, has served as a director since 2022. Mr. Kim has been the Chief Executive Officer of Match Group, Inc. since 2022. From 2016 to 2022, he served as the President of Publishing for Zynga Inc., a global leader in interactive entertainment with a mission to connect the world through games. Prior to joining Zynga, Mr. Kim spent nearly ten years at Electronic Arts Inc., as the company's Senior Vice President of Mobile Publishing. In that role, he oversaw EA's mobile distribution, strategy, product management, analytics, network engagement, marketing, revenue demand planning, business development, third-party publishing, and mergers & acquisitions. Before joining EA, Mr. Kim served as Director of Sales and Channel Strategy at The Walt Disney Company, where he led sales and retail for Disney Mobile. He holds Bachelor of Arts degrees in both Economics and Communications from Boston College. Mr. Kim's senior leadership experience with large-scale, growing technology companies led to the conclusion that he should serve as a director of Five Below.

Defendant Markee

62.     Defendant Richard Markee ("Markee") has served as a member of the Company's Board since 2016. He is a member of the Board's Audit Committee and Chair of the Investment Committee.

63.     As a non-employee director, Markee received $, $249,942, $249,845, and $262,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

64.     The Company's 2025 Proxy stated the following about Markee:

**Richard L. Markee.** Mr. Markee, 71, has served as a director since May 2016. Mr. Markee currently serves as a director of Macy's, Inc. Previously, Mr. Markee served in various leadership positions at Vitamin Shoppe, Inc., including as Non-Executive Chairman from January 2016 to June 2016 and from April 2007 to September 2009, Executive Chairman from April 2011 to January 2016 and Chief Executive Officer and Chairman of the Board from September 2009 to April 2011. He held senior management positions at Toys "R" Us, Inc. from 1998 through November 2006, including Vice Chair of Toys "R" Us, Inc. and President of the Babies "R" Us and the Toys "R" Us U.S. and international operation divisions from August 2004 through November 2006. Mr. Markee previously served as a director of Collective Brands, Inc., The Sports Authority, Inc., Dorel Industries and Toys "R" Us. Mr. Markee's extensive experience in the retail industry led to the conclusion that he should serve as a director of Five Below.

Defendant Ryan

65.     Defendant Thomas Ryan ("Ryan") has served as a member of the Company's Board since 2011. He is a member of the Board's Nominating and Governance and Investment Committees.

66.     As a non-employee director, Ryan received $259,214, $249,845, and $262,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

67.     The Company's 2025 Proxy stated the following about Ryan:

**Thomas M. Ryan.** Mr. Ryan, 72, has served as a director since 2011. In 2011, Mr. Ryan became an operating partner of Advent International Corporation as a part of its Operating Partner Program. Prior to joining our board of directors, Mr. Ryan served as the Chairman of the board of directors, President and Chief Executive

Officer of CVS Caremark Corporation, now CVS Health, a retail pharmacy and healthcare corporation, until he retired in 2011. Mr. Ryan became the Chief Executive Officer of CVS Corporation in 1998 and he also served as the Chairman of the board of directors of CVS Corporation from 1999 to 2007. Mr. Ryan also served as the Chairman of CVS Health's board of directors from 2007 to 2011. Mr. Ryan currently serves as a director of PJT Partners and previously served as a director of Bank of America Corporation, Yum! Brands, Inc. and Vantiv, Inc. Mr. Ryan's experience in the retail industry, as both an executive officer and director of a large retail company, led to the conclusion that he should serve as a director of Five Below.

Defendant Sargent

68.    Defendant Ronald Sargent ("Sargent") has served as a member of the Company's Board since 2004. He is Chair of the Board's Compensation Committee and serves on the Nominating and Governance Committee.

69.    As a non-employee director, Sargent received $249,942, $249,845, and $262,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

70.    The Company's 2025 Proxy stated the following about Sargent:

**Ronald L. Sargent.** Mr. Sargent, 69, has served as a director since 2004. Mr. Sargent currently serves as the Interim Chief Executive Officer and Chair of the board of directors of The Kroger Co., having previously served as Lead Director, Chairman of the governance committee and as a member of the audit and public responsibilities committees. Mr. Sargent also served as the Chief Executive Officer of Staples, Inc., an office supply company, from 2002 to June 2016 and as Chairman of its board of directors from 2005 to January 2017. He currently serves as a director of Wells Fargo & Co., where he serves as the Chairman of the human resources committee and as a member of the governance and nominating committee and the audit committee. Mr. Sargent previously served as a director of The Home Depot, Inc. and Mattel, Inc. Mr. Sargent's experience as an executive officer and director of Staples, Inc. as well as his extensive experience in the retail industry led to the conclusion that he should serve as a director of Five Below.

71.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Sargent executed the following sales of Company stock:

| Date of Sale | # of Shares | Share Price | Sale Proceeds |
|:---:|:---:|:---:|:---:|
| 4/4/2023 | 10,000 | $206.34 | $2,063,419 |
| 6/7/2023 | 55 | $193.03 | $10,617 |
| **Total** | **10,055** | | **$2,074,036** |

72.     In total, before the fraud was revealed, Defendant Sargent sold 10,055 shares of Company stock based on inside information, receiving approximately $2,074,036 in proceeds. This insider sale, executed with knowledge of material nonpublic information prior to the exposure of the material misstatements and omissions, reflects his motive in facilitating and participating in the scheme.

<u>Defendant Vaughn</u>

73.     Defendant Mimi Vaughn ("Vaughn") has served as a member of the Company's Board since 2023. She serves on the Board's Nominating and Governance and Compensation Committees.

74.     As a non-employee director, Vaughn received $129,806, and $262,945 in total compensation during FYs 2023, and 2024 respectively.

75.     The Company's 2025 Proxy stated the following about Vaughn:

**Mimi E. Vaughn.** Ms. Vaughn, 58, has served as a director since September 2023. Ms. Vaughn is currently President, Chief Executive Officer and Chair of the Board of Genesco Inc. (NYSE: GCO), the parent company of teen retail leader Journeys. Ms. Vaughn joined Genesco in September 2003 as vice president of strategy and business development. She was named senior vice president, strategy and business development in October 2006, senior vice president of strategy and shared services, including information technology and human resources, in April 2009 and senior vice president – finance and chief financial officer in February 2015. In May 2019, Ms. Vaughn was named senior vice president and chief operating officer and continued to serve as senior vice president-finance and chief financial officer until her successor was appointed in June 2019. In October 2019, Ms. Vaughn was appointed to become president and chief executive officer of the Company on February 2, 2020 and was appointed as a director effective October 30, 2019. Prior

to joining the Company, Ms. Vaughn was executive vice president of business development and marketing, and acting chief financial officer from 2000 to 2001, for Link2Gov Corporation in Nashville. From 1993 to 1999, she was a consultant at McKinsey & Company in Atlanta. Ms. Vaughn's senior leadership experience in multi-brand specialty retail, with a particular focus on the teen customer, led to the conclusion that she should serve as a director of Five Below.

Defendant Washington

76.     Defendant Zuhairah Washington ("Washington") has served as a member of the Company's Board since 2020. She serves on the Board's Audit and Compensation Committees.

77.     As a non-employee director, Washington received $249,942, $249,845, and $262,945 in total compensation during FYs 2022, 2023, and 2024 respectively.

78.     The Company's 2025 Proxy stated the following about Washington:

**Zuhairah S. Washington.** Ms. Washington, 47, has served as a director since September 2020. Ms. Washington is currently a senior vice president and general manager at Zillow Group. Previously, Ms. Washington was President and Chief Executive Officer at Otrium, a purpose-driven online marketplace for designer outlet fashion brands. Prior to Otrium, Ms. Washington was SVP and Global Head of Strategic Partners, Lodging and Vacation Rentals at Expedia Group, whose brands include Expedia, Hotels.com, Orbitz and VRBO, from January 2019 to August 2021. Prior to joining Expedia, Ms. Washington was at Egon Zehnder, a global management consulting and executive search firm, from 2018 to 2019, and Uber, where she grew businesses from startup to scale and ran one of the top five U.S. markets, from 2013 to 2018. She also founded Kahnoodle, which was named to Entrepreneur Magazine's 100 Brilliant Companies of 2012. Ms. Washington currently serves as a director and a member of the audit committee of Olo, the leading on-demand e-commerce platform for the restaurant industry. Ms. Washington earned a joint graduate degree: a JD from Harvard Law School and an MBA from Harvard Business School, and graduated magna cum laude from UCLA with a BA in political science and public policy. In March of 2020, she was named as one of the 100 Most Influential Black Executives in Corporate America by Savoy Magazine. Ms. Washington's senior leadership experience with large-scale, growing technology companies led to the conclusion that she should serve as a director of Five Below.

**Relevant Non-Party Park**

79.     Relevant non-party Winnie Park ("Park") has served as CEO and member of the Company's Board since 2024.

80.    For fiscal year 2024, Defendant Park received a total of $1,204,010 in compensation from the Company. This included $126,923 in salary, $999,915 in stock awards, and $77,172 in all other compensation.

81.    The Company's 2025 Proxy Statement stated the following about Park:

**Winnie Y. Park.** Ms. Park, 50, joined Five Below as our Chief Executive Officer and as a director in December 2024. She previously served as Chief Executive Officer of Forever 21 from January 2022 to December 2024. Prior to that, Ms. Park was Chief Executive Officer of Paper Source, Inc. from 2015 to 2021. In March 2021, Paper Source filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Virginia and was subsequently acquired by an affiliate of Elliott Investment Management. Earlier in her career, Ms. Park served as Executive Vice President, Global Marketing and Ecommerce, and Vice President, GMM, Merchandising at Duty Free Shoppers (DFS), a division of LVMH, and held roles at Levi Strauss & Co. and McKinsey & Company. Ms. Park also served on the Board of Directors of Dollar Tree, Inc. from 2020 to 2024. The breadth of her leadership experience, especially her merchandising expertise, customer acumen, strong global background, and how she values people and champions organizational culture led to the conclusion that Ms. Park should serve as a director of Five Below.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

82.    By reason of their positions as officers, directors and/or fiduciaries of Five Below and because of their ability to control the business and corporate affairs of Five Below, the Individual Defendants owed Five Below and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Five Below in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Five Below and its shareholders to benefit all shareholders equitably.

83.    Each director and officer of the Company owes Five Below and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

84.    As fiduciaries of Five Below, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

85.    The officers and directors of Five Below were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

86.    Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Five Below's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

87.    The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

88.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things the Individual Defendants were required to:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania and the United States, and pursuant to Five Below's Code of Business Conduct and Ethics and other internal guidelines;

(b)    conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Five Below conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic, accurate records and reports of the business and internal affairs of Five Below and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Five Below's operations would comply with all laws and Five Below's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over Company's officers' and employees' public statements and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

89.    Each of the Individual Defendants further owed  Five Below's and the shareholders the duty of loyalty requiring that each favor Five Below's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

90.    At all times relevant hereto, the Individual Defendants were the agents of each other and Five Below and were at all times acting within the course and scope of such agency.

91.    The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Five Below.

92.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Five Below.

### Five Below's Code of Business Conduct and Ethics

93.    Five Below's Code of Business Conduct and Ethics ("Code of Conduct") specifies that: "[e]ach officer, director and employee of the Company is [] responsible for conducting the Company's business in a manner that demonstrates a commitment to the highest standards of integrity, honesty and compliance with the law."

94.    It applies to "all officers, directors and employees of the Company," and "[t]hroughout the Code and any policies related to the Code the term 'employee' refers to all officers, directors and employees of the Company unless otherwise indicated."

95.    The Board is "responsible for monitoring compliance with the Code and shall assess

the adequacy of the Code periodically and approve any changes to the Code."

96.    The purpose of the Code of Conduct is:

to focus on areas of ethical or legal risk, provide guidance to help recognize and
deal with ethical and legal issues, provide mechanisms to report unethical or illegal
conduct, and foster a culture of honesty and accountability. Dishonest or unethical
conduct or conduct that is illegal will constitute a violation of the Code, regardless
of whether such conduct is specifically referenced herein.

The Code seeks to deter wrongdoing and to promote the conduct of all Company
business in accordance with the following standards:
• Honest and ethical conduct, including the ethical handling of actual or apparent
conflicts of interest between personal and professional relationships;
• Respectful conduct promoting a positive and inclusive work environment;
• Full, fair, accurate, timely and understandable disclosure in the periodic reports
and documents required to be filed with, or submitted to, the Securities and
Exchange Commission (the "SEC") by the Company and in other public
communications by the Company;
• Compliance with applicable governmental laws, rules and regulations;
• Protection of Company assets, including corporate opportunities and confidential
information;
• The prompt internal reporting of violations of the Code to an appropriate person
or persons identified in the Code; and
•Accountability for adherence to the Code.

97.    The Code of Conduct details "employee" responsibilities as the following:

• Each Company employee shall comply with the letter and spirit of all applicable
laws, rules and regulations, the Code and the policies and procedures of the
Company.
• All employees who observe, learn of, or, in good faith, suspect a violation of the
Code, applicable laws, rules and regulations should promptly report such matters
through their normal reporting channels, to the Compliance Officer, to any
executive officer of the Company as appropriate, or through the Company's
Whistleblower Hotline.
• If an employee does not believe that their concerns have been adequately
addressed, the employee should seek advice through the Company's Whistleblower
Hotline.
• Failure to comply with any responsibilities established by the Code may result in
disciplinary action, up to and including termination, may require restitution or
reimbursement from the employee and referral of the matter to government
authorities. Discipline may also be imposed for conduct that is considered unethical
or improper even if the conduct is not specifically covered by the Code.

• All employees are required to (physically or electronically) confirm compliance with the Code at the time of hire and thereafter when requested by the Company.

98.    The Code of Conduct also states the following regarding compliance with laws, rules

and regulations:

A variety of laws apply to the Company and its operations. The Company requires that all employees comply with all laws, rules and regulations applicable to the Company, both in letter and in spirit. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors. Employees are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to seek advice when there is any uncertainty. Any violations of laws, rules and regulations can potentially result in civil and criminal penalties as well as disciplinary action from the Company. The examples of relevant laws given below are not meant to be an exhaustive list of regulations, but rather summaries of some relevant laws of which an employee should have knowledge.

A.  Compliance with Insider Trading

Throughout the course of employment, employees may be exposed to material, nonpublic information with respect to the Company or other companies with which the Company engaged in business dealings (each an "External Party," and, collectively "External Parties"). Employees are expressly prohibited from trading (i) in the securities of the Company while in possession of material, non-public information about the Company and (ii) in the securities of any External Party while in possession of material, non-public information regarding such External Party that they become aware of as a result of business dealings between the Company and such External Party. Further, employees are prohibited from recommending, "tipping" or suggesting that anyone else trade in the securities of the Company or any External Party on the basis of such material, non-public information. Employees should consult the Company's Insider Trading Policy for further details regarding the prohibition on insider trading.

99.    Regarding conflicts of interest, the Code states:

A "conflict of interest" occurs when an individual's personal interest (or the interest of a member of his or her family) may or does interfere with the interests of the Company or the employee's work-related duties. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult for that employee to objectively and effectively carry out his or her expected employment functions. Conflicts of interest may also arise when an employee, or a member of his or her family, receives personal benefits as a result of his or her position in the Company or when Company resources are used for personal purposes.

Any direct or indirect conflict of interest between the Company and any employee is prohibited unless otherwise consented to by the Company. All employees have a responsibility to the Company to disclose any situation that is, or reasonably could be expected to give rise to, a conflict of interest. If an employee, other than a director or an executive officer, feels that he or she may have a conflict of interest or a potential conflict of interest, such employee should discuss the matter with, and seek a determination and prior authorization or approval from, their supervisor or the Compliance Officer. A supervisor may not authorize or approve conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first providing the Compliance Officer with a written description of the activity and seeking the Compliance Officer's written approval. If the supervisor is involved in the potential or actual conflict, the matter should instead be discussed directly with the Compliance Officer. Conflicts of interest involving directors or executive officers must be referred to the Audit Committee for consideration; provided, however, that only the Board may approve, after receiving the Audit Committee's recommendations and by a majority vote of disinterested directors, the resolution of a conflict of interest involving directors and executive officers.

It is not possible to describe every situation or occurrence that could lead to a conflict of interest between an employee and the Company. The following events are intended to describe, by way of example, situations that could occur that constitute or could lead to a conflict of interest with the Company:

• Related Parties. Employees should avoid conducting business transactions with any related person without obtaining prior written approval in accordance with the Code. "Related person" is defined to include directors, executive officers, nominees for the board, beneficial owners of 5% or more of any class of the Company's voting securities and their immediate family members. "Immediate family members" include children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law and any person sharing the household of such person (other than a tenant or employee).

• Business Relationships. Employees shall not engage in simultaneous employment by, consulting for or owning, whether directly or indirectly, a significant financial interest in, other than a financial interest which constitutes less than 10% of the outstanding voting securities of, any entity that does business, seeks to do business or competes with the Company without prior written approval in accordance with the Code.

• Service on Boards and Committees. An employee must not serve on the board of directors, advisory board, or committee of any entity with which the Company has a business relationship or whose interests would be expected to conflict with those of the Company without prior written approval in accordance with the Code.

• <u>External Parties</u>. An employee shall not use his or her positions with the Company to influence a transaction with any External Parties in which such employee or an immediate family member has any significant personal interest.

• <u>Personal Use of Company Property and Company Information</u>. Employees shall not use or divert any Company property, materials, equipment, systems or procedures, including services of other employees and Company information, for their own advantage or benefit or for use in outside business activities or non-business activities unrelated to the Company, or otherwise use the Company's name or influence for their personal benefit.

Conflicts of interest may not always be clear-cut, so if you have a question, you should consult with your supervisor or the Compliance Officer.

100.    Furthermore, no "employee" may:

personally profit from his/her relationship with the Company if it is at the expense of the Company. Employees are prohibited from usurping and may not improperly gain from a corporate opportunity discovered during the course of serving the Company, through the use of the Company's resources, property or information, or as a result of such individual's position with the Company, and employees may not otherwise compete with the Company. Each employee owes a duty to the Company to inform the Company of any business opportunity learned through the course of employment. Any employee who learns of a corporate opportunity must obtain prior written consent of the Board before taking advantage of any such opportunity.

In some cases, our policies specifically outline your responsibilities under certain laws and regulations. For example, internal policies specify strict guidelines about how Five Below's products can be marketed or sold, and the required licensing, communications and behavior of those who sell the products. Misconduct may be punished, up to and including termination of employment and, in some cases, criminal prosecution.

101.    Moreover:

Beyond compliance with laws, the Company requires that its employees act in a manner which meets the highest standards of ethical behavior. The honesty and integrity of our business conduct must not be compromised. The Company will not condone ethical violations for the sake of personal gain, personal advantage, expediency or perceived business advantage.

The Company has an interest in maintaining a fair and competitive marketplace and friendly work environment. In order to achieve that standard, the Company expects its employees to maintain honest and ethical standards dealing with each other and the Company's competitors as well as when transacting business with External Parties. Employees must not take unfair advantage of anyone, including fellow employees, through the manipulation, concealment or abuse of privileged

information, misrepresentation of material facts or any other intentional unfair-dealing practice. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. In addition to the maintenance of honest and ethical standards in disseminating information, employees must gather information about other companies and organizations, including competitors, using appropriate methods. Stealing proprietary information, knowingly possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. Each employee should endeavor to respect the rights of and deal fairly with the Company's External Parties, competitors and employees.

102.    Regarding communications with the public, the Code of Conduct specifies the following:

The Company must monitor public communication about the Company in order to maintain credibility and a positive reputation in the community. News media can have a direct impact on the Company's profitability and its ability to achieve its mission. The Company's policy is to provide timely, accurate and complete information in response to media inquiries consistent with its obligations to maintain the confidentiality of proprietary information and to prevent selective disclosure of market-sensitive financial information. The Company is also required by federal securities laws to publicly disclose all material, non-public information that has been provided to securities professionals or shareholders. In order for the Company to manage its public reputation and comply with applicable laws, employees must direct any news media or public requests for information to Investor Relations via email to InvestorRelations@Fivebelow.com, who will assist in evaluating the inquiry and creating an appropriate response to the request.

103.    Moreover, the Code of Conduct states the following regarding the protection and proper use of company assets:

Safeguarding Company assets is the responsibility of all employees. The Company's ability to achieve its mission requires the efficient and appropriate use of the Company's assets and resources, including information systems, resources, stores and distribution centers, inventory and cash. Theft, carelessness and waste have a direct impact on the Company's profitability. Employees are expected to:

• Use Company assets according to all Company policies and procedures, comply with policies and security programs that help prevent their unauthorized use or theft, and abide by all regulations or contractual agreements governing their use.

• Protect from disclosure or misuse all non-public information pertaining to the Company.

• Protect from disclosure any proprietary information including intellectual property, business, marketing and service plans, databases, records, salary information and any unpublished financial data and reports.

• Not use Company property or non-public information of the Company to gain a personal profit; nor may any employee make such property or information available to any family member, friend, business associate or other person for the benefit of such other person.

• Take actions necessary to safeguard all passwords and identification codes to prevent unauthorized access to the Company's information systems or resources.

• Read and comply with all information technology policies and their applicable procedures.

104.    Lastly, regarding financial reporting, the Code of Conduct specifies :

The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations. The Company must also maintain a system of internal accounting controls that meet applicable laws, rules and regulations, and prepare financial statements in accordance with generally accepted accounting principles and applicable laws, rules and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including but not limited to, the Executive Chairman, Chief Executive Officer, Chief Financial Officer, principal accounting officers and persons performing similar functions) must conduct themselves using high ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.

All employees must conduct themselves using high ethical standards in a manner that allows the Company to prepare financial accounts, other reports and records that are fair, accurate and appropriately authorized.

• No management employee, officer or director may override, or direct others to override, the Company's established system of internal controls over financial reporting and disclosure.

• No fund, asset or liability of the Company shall be created or permitted to exist unless it is fully and properly disclosed and recorded on the Company's

books and records in the manner required by law and applicable accounting standards.

- Transactions of the Company are to be executed only in accordance with management's general or specific authorizations.

- No false, artificial or misleading entries may be made in the books and records of the Company for any reason and no employee may engage in any arrangement that results in such prohibited act.

- No transaction shall be effected and no payment on behalf of the Company may be approved or made with the intention or understanding that any part of the transaction or payment is to be used for any purpose other than that described by the documents supporting the transaction or payment.

Any uncertainty by an employee about judgments concerning accounting or tax matters should be discussed with a superior; when in doubt, ask for guidance.

No one shall take any action to fraudulently influence, coerce, manipulate or mislead any internal or external auditor engaged in the performance of an audit of the Company's financial statements.

## Five Below's Corporate Governance Guidelines

105.    In addition to those duties enumerated above, under the Company's Corporate Governance Guidelines (the "Guidelines"), the Director Defendants owed specific additional duties to Five Below.

106.    The purpose of the Guidelines is "to assist the Board in carrying out its oversight responsibilities and to serve the best interests of the Company." Furthermore,

The Guidelines should be applied in a manner consistent with applicable legal, regulatory and ethical requirements for effective corporate governance and in accordance with the rules of The NASDAQ Stock Market LLC ("NASDAQ"), the Company's Amended and Restated Articles of Incorporation (the "Charter"), the Company's Amended Bylaws ("Bylaws"), each as may be amended or restated from time to time, and the committee charters. These Guidelines are intended to serve as a flexible framework for the conduct of the Board's business, and are not intended to interpret applicable laws or regulations or limit the duties or protections afforded under applicable laws or regulations.

107.    Pursuant to the Guidelines, the role of the Board includes:

(A)    Fiduciary Duties of the Directors. The members of the Board are elected by the shareholders of the Company to oversee, and provide strategic guidance to, senior management of the Company. As a director, each Board member stands in a fiduciary relationship to the Company. As such, each director is required to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

(B)    Primary Responsibilities of the Board. The primary function of the Board is to oversee the affairs of the Company for the benefit of the Company's shareholders and other stakeholders, while day-to-day operation of the Company is the responsibility of management. Consistent with that role, the following are the primary responsibilities of the Board, some of which may be delegated to committees:

(1)    providing general strategic guidance and oversight to the Company's management, including with respect to the Company's current performance, its long-term strategic plans and financial objectives, and the principal risk exposures of the Company;

(2)    evaluating the performance of the Company and its senior management, by (i) overseeing the management of the Company's business to evaluate whether it is being effectively managed and (ii) selecting, regularly evaluating and planning for the succession of the Chief Executive Officer ("CEO") and other key executives as the Board deems appropriate;

(3)    assisting management in the oversight of processes designed to ensure compliance by the Company with applicable laws and regulations, including in connection with the public reporting obligations of the Company;

(4)    overseeing management with a goal of ensuring that the assets of the Company are safeguarded through the maintenance of appropriate accounting, financial and other controls; and

(5)    evaluating the overall effectiveness of the Board, as well as selecting and recommending to shareholders for election to the Board an appropriate slate of director nominees.

(C)    Reliance on Information. In executing his or her duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following unless such director has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(1)    one or more officers or employees of the Company whom the directors reasonably believe to be reliable and competent in the matters presented;

(2)    counsel, public accountants or other persons as to matters which the directors reasonably believe to be within the professional or expert competence of such person; or

(3)    a committee of the Board upon which the director does not serve, duly designated in accordance with law, as to matters within its designated authority, which committee the director reasonably believes to merit confidence.

(D)    Legal and Ethical Conduct. The Board is committed to legal and ethical conduct in fulfilling its responsibilities. The Board expects all directors, as well as officers and employees of the Company, to adhere to the Company's Code of Business Conduct and Ethics.

(E)    Indemnification. In connection with the performance of the aforementioned duties, directors shall be entitled to indemnification to the fullest extent permitted, and exculpation as provided, by Pennsylvania law, the Charter and the Bylaws. Directors shall also be entitled to reasonable directors' and officers' liability insurance purchased by the Company on their behalf.

108.    Regarding board composition and selection, the Guidelines state:

(A)    Size of Board. The number of directors shall be established by the Board in accordance with the Bylaws. The Board believes that a range of three to fourteen directors is appropriate, but the Board should be willing to change its size, from time to time, depending on circumstances and changes in the Company's business. The Charter and the Bylaws provide for the annual election of directors, with the directors classified into three classes of directors as nearly equal in number as possible, until the 2025 annual meeting of the shareholders of the Company, at which time the directors will no longer be divided into classes. The Board, on the recommendation of its Nominating and Corporate Governance Committee, shall evaluate and determine the appropriate size and composition of the Board.

(B)    Independence of Directors. It is the Company's policy that the Board be composed of not less than a majority of independent directors. The Company defines "independent director" as those directors who (1) are neither current or former officers of the Company; (2) have no direct, indirect or material relationship with the Company; and (3) otherwise satisfy the independence criteria established by applicable laws, regulations, and NASDAQ listing requirements. The Board expects directors to disclose any relationship that might call their independence into question. The Board shall review annually the independence of all non-employee directors and in making the determination, the Board shall consider all relevant

facts and circumstances. In addition, the Board may adopt more stringent requirements to determine the independence of directors serving on various committees of the Board, such as the audit committee.

(C)     Leadership Structure. The Board should remain free to configure leadership of the Board and the Company in the way that best serves the Company's interests at the time and, accordingly, has no fixed policy with respect to combining or separating the offices of Chairman of the Board ("Chairman") and CEO. In the event that the Chairman is not independent, the Board may but is not required to appoint a lead independent director, who shall be selected by a majority of the independent directors and who shall preside over executive sessions of the Board. The Chairman, whether or not independent, and any lead independent director would be expected, among other things, to devote a greater amount of time to Board service than other non-management directors.

(D)     Board Membership Criteria and Selection.

(1)     Recommendations for Director Nominees. The Board is responsible for nominating individuals for election to the Board, including those individuals who have been nominated by the Company's shareholders. The Board is also responsible for filling vacancies on the Board that may occur between annual meetings of shareholders. The Board has delegated to the Nominating and Corporate Governance Committee the responsibility to make director recommendations to the full Board.

(2)     Criteria for Nominees. The Nominating and Corporate Governance Committee of the Board is responsible for facilitating director assessments, identifying skills and expertise that candidates should possess, and screening, selecting and recommending candidates for Board approval based on such committee's assessment of the current needs of the Board in performing their oversight function effectively. In discharging this responsibility, the Nominating and Corporate Governance Committee, in accordance with its charter and the Guidelines and Procedures for Identifying and Evaluating Candidates for Director, considers the nature of the expertise and experience required for the performance of the duties of a director of a company engaged in the business of the Company, and such matters as the candidate's relevant business and industry experience, professional background, age, current employment, community service and other board service. The Nominating and Corporate Governance Committee shall also consider the racial, ethnic and gender diversity of the Board. The Nominating and Corporate Governance Committee seeks to identify, as candidates for director, persons with a reputation for and record of integrity and good business judgment who (a) have experience in positions with a high degree of responsibility and are leaders in the organizations with which they are affiliated, (b) are free from conflicts of interest that could interfere with a director's duties to the Company, and (c) are willing and able to make the necessary commitment of time and attention required for effective Board service. The Nominating and Corporate

34

Governance Committee also takes into account the candidate's level of financial literacy.

(E)    Other Directorships. The Company recommends that all directors limit the number of for-profit company boards on which he or she serves so that he or she is able to devote adequate time to his or her duties to the Company, including preparing for and attending meetings. Directors should advise the Chairman and the chairperson of the Nominating and Corporate Governance Committee in advance of accepting an invitation to serve on another for-profit company board and consider the requirements of subsection (G) below prior to accepting such invitation.

(F)    Term Limits; Retirement Policy. The Board does not limit the number of terms for which an individual may serve as a director. Moreover, the Board has not implemented a mandatory retirement age for directors. The Nominating and Corporate Governance Committee periodically reviews incumbent directors and the strengths and weaknesses of the Board as a whole. This review includes consideration of a director's length of service on the Board, his or her interest in continuing as a member of the Board and the specific experience, qualifications, attributes and skills the director brings to the Board in light of the Company's business and its needs at the time.

(G)    Change in Principal Position or Responsibility. The Company requires that any director who experiences a material change in his or her principal employment or professional position, or is placed in a position that may adversely affect his or her duties to the shareholders of the Company (including, without limitation, as a member of a board of directors of another for-profit company), offer to resign from the Board. The Nominating and Corporate Governance Committee shall recommend to the Board the action to be taken with respect to any such offer of resignation received from a director.

109.    Regarding meetings, the Guidelines specify:

(A)    Frequency of Board Meetings. The Board currently plans at least four regularly scheduled meetings each year. Additional meetings are held as needed and are called in accordance with the Bylaws. The Chairman, or the lead independent director, if applicable, in consultation with the CEO and Board members, will determine the agenda and length of the meetings.

(B)    Meeting Attendance. Directors are expected to attend all or substantially all Board meetings and meetings of the committees of the Board on which they serve. In no event shall a director attend fewer than 75% of the aggregate of (1) the total number of meetings of the Board held during the period for which he or she has been a director and (2) the total number of meetings held by all committees of the Board on which he or she served during the periods of such

service each year. The Board expects all directors to attend the annual meeting of shareholders.

(C)    Preparation for Meetings. Materials with respect to matters on which action is expected to be taken shall be circulated to the Board in advance of the meeting whenever possible, and directors are expected to review these materials in advance of the meeting. Financial reports, certain Board committee minutes and other background materials shall also be circulated in advance of the meeting. Directors are expected to spend the time needed to review any materials prior to a meeting in order to uphold their fiduciary obligations to the Company, the shareholders and other stakeholders when discharging their responsibilities.

(D)    Management Involvement in Board Meetings. At the invitation of the Board, members of senior management or employees recommended by the CEO shall attend Board meetings or portions thereof for the purpose of participating in discussions where such members of senior management or other employees can provide insight into the items being discussed. The Board encourages the directors and members of the committees to bring Company management and outside advisors or consultants from time to time into Board and/or committee meetings to (1) provide insight into items being discussed by the Board which involve the manager, advisor or consultant, (2) make presentations to the Board on matters which involve the manager, advisor or consultant, and (3) bring managers with high potential into contact with the Board. Attendance of non-directors at Board meetings is at the discretion of the Board.

(E)    Executive Sessions of Non-Employee Directors. The non-employee directors shall meet in executive session at least twice per year to, among other matters, review the performance of the CEO. The Chairman (if independent), or the lead independent director, if applicable, or in the absence of a lead independent director, the chair of the Nominating and Corporate Governance Committee, shall lead regularly scheduled meetings of non-employee directors following Board meetings to discuss matters as such non-employee directors consider appropriate. To the extent that any non-employee director should not be deemed independent under Section 2.B, the independent directors shall meet in an executive session at least once a year, with such meeting to be led by the Chairman (if independent), or the lead independent director, if applicable, or in the absence of a lead independent director, the chairperson of the Nominating and Corporate Governance Committee.

110.    Regarding committees:

(A)    Number and Type of Committees; Independence of Members. The Board shall at all times have an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee. Each such Board committee shall have a written charter that has been approved by the Board and shall be composed entirely of independent directors, except to the extent allowed under applicable laws, regulations, and NASDAQ listing requirements. The Board may

from time to time, establish, maintain, and disband additional committees depending on internal needs and in compliance with the Bylaws and applicable laws, regulations, and NASDAQ listing requirements.

(B)    Committee Member Selection.

(1)    The Nominating and Corporate Governance Committee shall make recommendations to the Board with respect to Board committee members and committee chairpersons. In making such recommendations, the Nominating and Corporate Governance Committee shall take into account the desires of the individual Board members, the criteria set forth in the applicable committee charter and such other criteria that it determines to be appropriate in light of the responsibilities of each committee.

(2)    The Board shall annually appoint committee members and chairpersons of each such committee taking into consideration the recommendations of the Nominating and Corporate Governance Committee in accordance with the Bylaws. Committee membership and the position of committee chair will not be rotated on a mandatory basis unless the Board determines that rotation is in the best interest of the Company.

(3)    Notwithstanding the foregoing, the Board affirmatively states that each member of the Audit Committee must be financially literate, as determined by the Board in its business judgment, or must become financially literate within a reasonable period of time after his or her appointment, and that at least one member of the Audit Committee must have accounting or related financial management expertise as determined by the Board in its business judgment.

(C)    Committee Meetings. The chairperson of each committee, in consultation with the committee members, will determine the frequency and length of the committee meetings consistent with any requirements set forth in the committee's charter. The chairperson of each committee, in consultation with management and committee members, shall develop the committee meeting agendas. Special meetings may be called from time to time as determined by the needs of the business and the responsibilities of the committees.

(D)    Committee Reports. Oral reports of committee meetings shall be provided to the full Board subsequent to each committee meeting.

111.    The Guidelines also include the following directions:

(A)    Risk Oversight, Assessment and Management. The Board and the appropriate committees shall consider and implement the Company's policies with respect to risk oversight, assessment and management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. The Board and the appropriate committees are encouraged to discuss with senior

management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

(B)     Director Evaluations. The Nominating and Corporate Governance Committee shall lead the Board in an annual evaluation, among other reasons, to determine whether the Board and its committees are functioning effectively and in compliance with these Guidelines. In any given year, such evaluation may include one or more self and peer reviews and assessments of the performance of each member of the Board and Board committees. The Nominating and Corporate Governance Committee shall review the continuing independence of each Board member. The Nominating and Corporate Governance Committee shall solicit comments from all of the directors and report annually to the Board on its assessment of the Board's performance and its recommendations for improvement. All directors are encouraged to make suggestions at any time for the improvement of the Board's practices.

(C)     Director Compensation. The Board believes that the level of director compensation should generally be competitive with that paid to directors of the Company's peer companies in the retail industry, and that a substantial component of such compensation should be tied to the performance of the Company. Accordingly, a significant portion of director compensation should be in the form of stock options and stock. The Compensation Committee shall periodically review the compensation of non- employee directors. The Compensation Committee is encouraged to seek advice from an independent compensation consultant and shall consider the potentially negative effect on director independence if director compensation and perquisites exceed customary levels. After such review, the Compensation Committee will make recommendations to the full Board, and the full Board will determine the non- employee director compensation. The Company's employee directors shall not receive additional compensation for service as directors.

(D)     Director Orientation and Continuing Professional Development. When new directors are elected, an orientation program shall be conducted which includes the introduction of new directors to the Company's senior officers and shall include presentations by management to familiarize new directors with the Company's strategic plans and business units. The orientation generally shall also include a visit to the Company's headquarters. Additionally, continuing professional development opportunities for all other directors shall be available through: (1) the Company's Board meetings and its meeting materials; (2) periodic presentations to the Board and its committees by the officers of the Company concerning the strategies, initiatives, business plans, management structure, compliance programs, and significant financial, accounting and risk management issues of the Company; (3) presentations to the Board or its committees by outside parties concerning industry issues and other business, legal and regulatory matters; (4) review of periodic filings and significant presentations made to investors; (5) attendance at the orientation program for new directors if desired; and (6) other professional

development opportunities, if appropriate and relevant to the duties of a director of the Company, including presentations and programs offered by various outside organizations, with appropriate expenses paid by the Company. Directors are expected to receive ongoing educational training from independent sources on their fiduciary responsibilities and liabilities and have an affirmative obligation to remain independently familiar with the business of the Company.

(E)    Stock Ownership by Directors. The Board believes that ownership of the Company's stock by directors strengthens their commitment to the future of the Company and further aligns their interests with those of the shareholders of the Company. Accordingly, the Board may from time to time establish policies pertaining to the ownership of Company stock by directors.

(F)    Independent Advisers. The Board and its committees shall have the authority to retain, at any time, independent or outside financial, legal or other advisers as the Board or its committees may deem appropriate and as authorized by applicable laws, regulations, and NASDAQ listing requirements. The Company will pay the fees and expenses of any such advisers.

(G)    Interactions with Third Parties. The Board recognizes that management speaks on behalf of the Company. Each director should refer all inquiries from institutional investors, the press, or customers to management. Individual Board members may, from time to time at the request of management, meet or otherwise communicate with various constituencies that are involved with the Company.

(H)    Director Access to Information and Employees. Directors shall have full and free access to any information about the Company that they deem necessary or appropriate to carry out their duties. This includes, among other things, access to officers and employees of the Company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or directly by the director. The directors shall use their judgment to ensure that any such contact is not disruptive to the business operations of the Company and shall, to the extent appropriate, copy the CEO on any written communications between a director and an officer or employee of the Company.

(I)    Implementation and Amendment of Guidelines. The Nominating and Corporate Governance Committee shall have primary responsibility for the implementation of these Guidelines. The Nominating and Corporate Governance Committee shall review these Guidelines at least annually and make recommendations to the Board as to any updates as necessary. These Guidelines may only be amended by the affirmative vote of a majority of the Board.

**Five Below's Audit Committee Charter**

112. In addition to the above duties, under the Audit Committee Charter in effect during relevant times, as members of the Audit Committee, Defendants Bowman, Buggeln, Lathi (Chair), Markee, and Washington (collectively the "Audit Committee Defendants") owed specific additional duties to Five Below.

113. Pursuant to the Audit Committee Charter, the Audit Committee Defendants have the responsibility and authority to:

> oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information and the audits of the Company's financial statements. The Committee shall also review the qualifications, independence and performance, and approve the terms of engagement, of the Company's independent auditor and prepare any reports required of the Committee under the rules of the Securities and Exchange Commission ("SEC").

> The Company shall provide appropriate funding, as determined by the Committee, to permit the Committee to perform its duties under this Charter, to compensate its advisors and to compensate any registered public accounting firm engaged for the purpose of rendering or issuing an audit report or related work or performing other audit, review or attest services for the Company. The Committee, at its discretion, has the authority to initiate investigations and hire legal, accounting or other outside advisors or experts to assist the Committee, as it deems necessary to fulfill its duties under this Charter and applicable law. The Committee may also perform such other activities consistent with this Charter, the Company's Bylaws and governing law, as the Committee or the Board deems necessary or appropriate.

> The Committee's function is one of oversight only and shall not relieve the Company's management of its responsibilities for preparing financial statements which accurately and fairly present the Company's financial results and condition, or the responsibilities of the independent auditor relating to the audit or review of financial statements.

114. The Committee's authority and responsibilities include:

A. Oversight of the Company's Independent Auditor

> 1. Be directly and solely responsible for the appointment, compensation, retention and oversight of any independent auditor engaged by the Company for the purpose of preparing or issuing an audit report or performing other

audit, review or attest services, with each such auditor reporting directly to the Committee.

2.      Periodically review and discuss with the independent auditor (i) the matters required to be discussed by Statement on Auditing Standards No. 114, as amended, and (ii) any formal written statements received from the independent auditor consistent with and in satisfaction of Independence Standards Board Standard No. 1, as amended, including without limitation, descriptions of (x) all relationships between the independent auditor and the Company, (y) any disclosed relationships or services that may impact the independent auditor's objectivity and independence and (z) whether any of the Company's senior finance personnel were recently employed by the independent auditor.

3.      Obtain and review annually a report from the independent auditor describing (i) the independent auditor's internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review or peer reviews or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues, and (iii) all relationships between the independent auditor and the Company addressing the matters set forth in the Public Company Accounting Oversight Board Rule 3526.

4.      Evaluate annually the qualifications, performance and independence of the independent auditor, including a review of whether the independent auditor's quality-control procedures are adequate and a review and evaluation of the lead partner of the independent auditor, taking into account the opinions of management and report to the Board on its conclusions, together with any recommendations for additional action.

5.      Consult with the independent auditor to confirm the rotation of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit every five years, consider issues related to the timing of such rotation and the transition to new lead and reviewing partners, and consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm, and report to the Board on its conclusions.

6.      Approve in advance the engagement of the independent auditor for all audit services and non-audit services; provided, however, that (i) the Committee may establish pre-approval policies and procedures for any engagement to render such services, provided that such policies and procedures (x) are detailed as to particular services, (y) do not involve delegation to management of the Committee's responsibilities hereunder and (z) provide that, at its next scheduled meeting, the Committee is informed as to each such service for which the independent auditor is engaged pursuant to such policies and procedures, and (ii) the Committee may delegate to one or more members of the Committee the authority to grant pre-approvals for such services, provided that the decisions of

such member(s) to grant any such pre-approval shall be presented to the Committee at its next scheduled meeting.

7.      Meet with the independent auditor prior to the audit to discuss the planning and staffing of the audit. Discuss with the independent auditor the responsibilities, budget and staffing of the audit functions.

8.      Approve as necessary the termination of the engagement of the independent auditor and seek a replacement independent auditor.

9.      Establish policies for the hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company, taking into account the impact of such policies on auditor independence.

10.     Regularly review with the independent auditor any significant difficulties encountered during the course of the audit, any restrictions on the scope of work or access to required information and any significant disagreement among management and the independent auditor in connection with the preparation of the financial statements. Review with the independent auditor any accounting adjustments that were noted or proposed by the independent auditor but that were "passed" (as immaterial or otherwise), any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement, any "management" or "internal control" letter or schedule of unadjusted differences issued, or proposed to be issued, by the independent auditor to the Company, and any other material written communication provided by the independent auditor to the Company's management.

11.     Review with the independent auditor the critical accounting policies and practices used by the Company, alternative treatments of financial information within generally accepted accounting principles ("GAAP") that the independent auditor has discussed with management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor.

B.      Review of Financial Reporting, Policies and Processes To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:

1.      Review and discuss with management and the independent auditor the Company's annual audited financial statements and any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements and related notes should be included in the Company's annual report on Form 10-K.

2.   Review and discuss with management and the independent auditor the Company's quarterly financial statements.

3.   Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports, and consider with the independent auditor the matters required to be discussed by the applicable Auditing Standards issued by the Public Company Accounting Oversight Board.

4.   Review and discuss with management all press releases regarding the Company's financial results.

5.   Periodically meet separately with management, the Internal Auditor and with the independent auditor.

6.   Review with management, the Internal Auditor and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

7.   Review quarterly with management and the Internal Auditor management's assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ("Internal Controls"), review annually with the independent auditor the attestation to and report on the assessment made by management, if any, and consider whether any changes to the Internal Controls are appropriate in light of management's assessment or the independent auditor's attestation.

8.   Review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

9.   Review and discuss with management, the Internal Auditor and the independent auditor any off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings.

10. Discuss with management and the Internal Auditor the Company's major financial risk exposures and the steps management has taken to identify, assess, monitor, control, remediate and report such financial risk exposures.

11. Review with management and the independent auditor the effect of regulatory and accounting initiatives on the financial statements. Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in selection of an application of accounting principles. Consider and approve, if appropriate, changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor or management.

12. Review any analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effects of alternative GAAP methods on the financial statements.

13. Review any special audit steps adopted in light of material control deficiencies. Review with the independent auditor, management and the Internal Auditor the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

***

D.    Risk Management, Legal Compliance and Ethics

To further fulfill its responsibilities and duties, and in addition to the items described above, the Committee shall:

1.    Review with the chairman, chief executive officer, chief financial officer and Internal Auditor any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to or by the Internal Auditor or the independent auditor, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2.    Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. In furtherance of the foregoing, review, at least annually, the sufficiency of the Company's Policy and Procedures for Reporting and Investigating Complaints and make any changes thereto that the Committee deems advisable. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

3.    Consider and present to the Board for adoption a Code of Business Conduct and Ethics for all employees and directors, which meets the requirements of Item 406 of the SEC's Regulation S-K, and provide for prompt disclosure to the

public of any change in, or waiver of, such Code of Business Conduct and Ethics. Review such Code of Business Conduct and Ethics periodically and recommend such changes to such Code of Business Conduct and Ethics as the Committee shall deem appropriate, and adopt procedures for monitoring and enforcing compliance with such Code of Business Conduct and Ethics.

4.   As requested by the Board, review and investigate conduct alleged by the Board to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct.

5.   Discuss with management, the Internal Auditor and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

6.   Consider and implement guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

7.   As part of the Committee's risk assessment and management oversight, receive regular reporting from management and periodically review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.

8.   Review with the Company's counsel and report to the Board on litigation, material government and regulatory investigations and compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics.

9.   Prepare the Committee's report required by the rules of the SEC to be included in the Company's annual proxy statement.

10. Produce and provide to the Board on an annual basis a performance evaluation of the Committee's performance of its duties under this Charter. The performance evaluation shall be conducted in such a manner as the Committee deems appropriate. Any member of the Committee may present the evaluation to the Board either orally or in writing.

11. Regularly report to the Board on the Committee's activities, recommendations and conclusions.

12. As appropriate, review and reassess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

E.    Internal Audit

To further fulfill its responsibilities and duties, and in addition to the items described above, the Committee shall:

1. Approve the selection, appointment, and oversight of the Company's Internal Auditor, with such auditor reporting directly to the Committee.

2. Review the Company's internal audit activities, operating structure, resources and qualifications.

3. Review internal audit projects and annual budget, and receive updates regarding significant changes thereto.

4. Review with the Internal Auditor the status and results (including management's remedial actions) of audit projects.

5. Review all significant reports to management prepared by the Internal Auditor, and management's responses.

115.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Five Below, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company has already incurred, Five Below has needlessly expended and will continue to needlessly expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

116.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

117.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

118.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

119.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

120.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Five Below and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### The Company

121.    Five Below – so named because most of its products are priced between $1 and $5 – describes itself as "a leading high-growth value retailer."[3] Although marketed toward "teens, tweens, and beyond," the Company's SEC filings state: "[b]ased on our management's experience and industry knowledge, we believe our customer-centric, experience-first, innovative approach to retail has led to a loyal customer base and has fostered universal appeal across a variety of age groups beyond our target demographic."

122.    Five Below sells thousands of products across eight categories or "worlds": Style (clothing accessories), Room (home décor), Sports (balls, team merchandise, fitness accessories), Tech (cell phone, tablet, audio, and computer accessories), Create (arts and crafts), Party (party supplies, decorations, gag gifts), Candy, and New & Now (seasonal goods for holidays such as Christmas and Halloween).[4] Five Below represents that its merchandising strategy emphasizes maintaining core product categories within its stores, while also seeking to drive high product turnover and sales volume in order to keep its assortment current and encourage repeat customer visits.

123.    Five Below characterizes its products as "trend-right," meaning that its offerings are selected based on existing marketplace trends. A central component of the Company's value

---

[3] Five Below 2024 Form 10-K at 6.
[4] *Id*. at 6, 9.

proposition is its ability to identify and sell products aligned with consumer trends. Accordingly, the Company claims that it monitors demographic trends, historical sales data, and the performance of new product launches to ensure its merchandise remains relevant to customers, and further asserts that it employs a carefully planned merchandising strategy centered on trend-right and everyday products, supplemented by opportunistic vendor purchases designed to drive store traffic and deliver a consistently engaging shopping experience.

124. While Defendants Anderson and Bull were directly involved in virtually all aspects of Five Below's operations, other senior executives also played key roles. CFO Kristy Chipman, appointed in July 2023, was closely engaged in financial reporting and execution of the Triple-Double strategy, further explained below. Chief Retail Officer George Hill, who reported to Anderson, oversaw retail store operations and regularly received concerns and reports of problems from Regional Directors and District Managers. Similarly, Michael Romanko, Executive Vice President of Merchandising since 2015 and Chief Merchandising Officer since 2019 until his recent departure, was deeply involved in product selection and the "trend-right" strategy. Romanko also reported directly to Anderson.

125. In recent years, Five Below expanded both its product offerings and store count. A significant initiative before and during the Relevant Period was the introduction and expansion of "Five Beyond." First introduced in 2019 as "Ten Below," this section offered goods priced below $10. In 2021, Anderson announced its expansion to one-third of all stores, rebranded as "Five Beyond," a change that, according to contemporaneous reporting, gave the Company "wiggle

room" to charge more than \$10.[5] In 2022, Five Below converted 250 stores to the Five Beyond concept. In March 2023, Anderson declared: "our goal is for Five Beyond everywhere."

126.    Five Below also positioned itself as a significant expansion opportunity. When it filed its first Form 10-K in 2013, the Company operated 244 stores across 18 states and projected capacity for up to 2,000 locations.[6] By February 2024, Five Below operated more than 1,500 stores in 43 states and projected potential growth to 3,500 locations.[7]

127.    On March 30, 2022, announcing fourth-quarter results and a "record year," Anderson stated that Five Below would "continue to play offense and focus on innovation and experience as we navigate a dynamic macro environment related to the lingering impacts of the pandemic."

128.    As part of this strategy to "play offense," Anderson announced Five Below's "long-term vision," branded the "Triple-Double" plan. Under this plan, the Company would triple its store count by 2030 and double its sales and more than double its earnings per share by 2025. To achieve this, Anderson explained, Five Below planned "to open approximately 1,000 stores," including 375 to 400 over the following 2 years. Anderson concluded by assuring investors that Five Below's "teams remain dedicated to delivering high growth while executing against our key strategic initiatives within product, experience and supply chain, all while maintaining financial discipline and always placing the customer at the center of our decision-making."

129.    The Triple-Double initiative remained a central focus of the Company's throughout the Relevant Period. On its March 15, 2023 earnings call, Anderson announced the Company was

---

[5] Matthew Stern, *Will Five Below's Sales Go Above And Beyond With a New Store-In-Store Concept?*, RetailWire.com (Mar. 24, 2021).
[6] Five Below 2013 Form 10-K.
[7] Five Below 2024 Form 10-K.

transitioning from "strategy to execution." Two days earlier, Bull had been promoted to Chief Operating Officer to "focus on important building blocks of [Five Below's] Triple-Double growth vision." Bull himself declared he was "looking forward to driving the next chapter of growth at Five Below."

130.   Although ambitious, the Triple-Double plan underscored Five Below's dependence on executing its "trend-right" retail strategy. As a low-price retailer, Five Below had limited means to increase profits without expanding store volume and sales. At the start of the Relevant Period, the Company's gross margin was 32.2%, a 1.1% year-over-year decline, with further declines reported at year-end 2022 and in subsequent quarters. Because product-level margins were eroding, Five Below needed significant sales growth to increase net income. Execution of the trend-right strategy was critical: without in-demand products, store expansion (with each location carrying fixed costs for leases, labor, insurance, and utilities) would dilute profitability rather than "double" earnings.

131.   Indeed, the expansion plan itself implicitly recognized margin pressures: tripling the store base to merely double sales and earnings per share meant each new store would generate lower sales and margins than existing stores.

132.   Accordingly, even if implemented as intended, the Triple-Double plan carried substantial risks. To maintain profitability, Five Below needed to consistently execute its trend-right strategy to ensure that all stores, including the large number of newly opened locations, were fully stocked with products consumers wanted to drive consistent traffic.

133.   What Defendants did not disclose, *and instead actively concealed*, was that, in pursuing initiatives such as Five Beyond and the Triple-Double plan, Five Below failed to successfully identify, purchase, allocate, and stock merchandise that would drive success.

134.    In reality, as sales growth and expansion failed to meet targets, Defendants attributed the Company's disappointing results to "shrink," or inventory losses from theft or shoplifting, when the true cause was Five Below's failure to select the right products, ensure timely delivery of those products to stores, and/or maintain adequate internal inventory controls. By blaming shrink, Defendants mischaracterized external factors as the source of problems that were in fact internal and systemic.

135.    Defendants' misstatements and omissions concerning product selection, shrink mitigation, and expansion plans artificially inflated Five Below's stock price, which then declined sharply once the truth emerged.

### Five Below's Inability to Track Product Trends and Stock Stores Accordingly

136.    As explained above, central to Five Below's value proposition is its status as a "trend-right" retailer, which purportedly enables it to identify consumer trends and efficiently supply in-demand merchandise to its store locations. From the outset of the Relevant Period, Defendants repeatedly emphasized this point in press releases, earnings calls, SEC filings, and investor conferences.

137.    The Relevant Period commenced on December 1, 2022, the day after Five Below held its earnings call to discuss third quarter 2022 results. On that call, Defendant Anderson assured investors that the Company was in a "great position" moving forward, claiming: "***Our stores are stocked and ready with an amazing assortment of value products that promises to delight our customers***.[8] . . . [W]e're also excited for Five Beyond to provide new and extreme value products in different categories." Defendant Bull further represented on the same call that "***[o]ur teams continue to move quickly to adjust to changing customer preferences.***"

---

[8] All emphasis is added unless otherwise specified.

138.    Looking ahead to the holiday season, Defendant Anderson emphasized the Company's ability to supply stores with the right products, telling investors that Five Below was "***set up to deliver products to our growing store base even more efficiently***."

139.    Defendants Anderson and Bull reiterated this theme at the January 9, 2023 ICR Conference. When asked about Five Below's ability to capitalize on new trends, Defendant Anderson responded that trend recognition and execution were "***part of the secret sauce of Five Below. And it's kind of in our DNA, and it's not only about getting into a trend, but also knowing how to land the plane and get out of it***. . . . And we're pretty nimble and quick. There's not a lot of bureaucracy at Five Below. ***When we identify something, we move really quick to get that in the store, test it and then push it out to the stores***."

140.    In announcing fourth quarter 2023 financial results, Defendant Anderson again emphasized the Company's trend execution, stating: "***We stay on top of hot trends and swiftly move to capitalize on them. . . . The flexibility of our model*** . . . is unique and ***enables swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends***."

141.    Defendants continued these representations into the final months of the Relevant Period. At the January 8, 2024 ICR Conference, CFO Chipman touted the expansion of the "Five Beyond" section, stating: "Five Beyond conversions drive traffic, they elevate sales in the overall box and that includes both Five Below and Five Beyond products."

142.    As late as March 20, 2024, despite issuing disappointing guidance, Defendant Anderson continued to reassure investors that the Company's "buyers scour the globe to bring our customers the value, ***trends, wow and newness that keep them coming back to Five Below***." He

further stated that the "flexibility of our model with our 8 worlds is unique and enables our teams to ***quickly introduce trend-right relevant products*** to our customers."

143.    Securities analysts consistently accepted and echoed Defendants' representations. On December 1, 2022, Telsey Advisory Group reported that the Company had "exceeded expectations" due to "store expansion, innovation of its store format, trend-right product newness (e.g., Five Beyond items), enhancements to its supply chain network, and solid execution." That same day, Guggenheim described Five Below's merchandising as "Value-Oriented Merchandising Magic," asserting that "[u]nique, extreme value merchandising lies at the heart of the FIVE brand experience."

144.    Analysts continued this commentary throughout the Relevant Period. On March 16, 2023, Morgan Stanley reported that "key building blocks and initiatives [were] in place," while UBS stated that Five Below's "results demonstrate the allure of its value-oriented assortment." On June 1, 2023, Deutsche Bank reported that the Company's "value proposition [was] increasingly resonating with consumers" and described it as having "a compelling value offering" and a "nimble and scaling business model." On November 30, 2023, Telsey Advisory Group attributed increased guidance in part to Five Below's "trend-right and value-focused product newness."

145.    Even as late as June 6, 2024, analysts continued to endorse this narrative with Jefferies opining that "the inclusion of higher price-point products into the company's assortment should enhance FIVE's value offering and yield a multitude of benefits."

146.    Behind the scenes however, former Five Below employees consistently reported that, from at least the beginning of the Relevant Period, the Company lacked the ability to effectively identify consumer trends and ensure that stores received the merchandise customers actually wanted. As a result, Five Below locations, including newly opened stores, were frequently

burdened with excessive amounts of unwanted inventory or insufficient quantities of in-demand products, leaving customers dissatisfied. The Company's touted Five Beyond sections were often left entirely without inventory.

147.    These operational shortcomings had tangible effects on Five Below's overall strategy. As Defendants admitted during earnings calls on August 28 and December 4, 2024 (discussed further below), the Company was dramatically scaling back its product offerings, with a potential "20% reduction" in SKUs (stock keeping units, i.e., unique items).

148.    Accounts from former employees confirm these admissions and demonstrate that Five Below's problems existed throughout the Relevant Period, even as Defendants publicly represented otherwise.

149.    One former employee, who worked as a District Manager from 2018 to 2023, explained that Five Below's biggest issue was its inability to stock "trend-right" merchandise in sufficient quantities. He reported that when advertised trending items were unavailable, customers became visibly disappointed, and even when concerns were raised with supervisors, inventory problems remained unresolved. He further reported that Defendant Anderson personally visited stores, observed these inventory issues firsthand, and responded that merchandise was "in the pipeline, it's in the pipeline."

150.    The same former employee also attended meetings with senior executives, including Anderson, where inventory shortages of popular items such as Squishmallows and Hello Kitty merchandise were discussed. Despite repeated assurances that "you'll have enough of it," the problem persisted through the end of his tenure with the Company.

151.    Another former employee, who served as a District Manager in 2023, similarly reported that Five Below had significant difficulty identifying and stocking trending items.

According to her, the Company lacked adequate systems for product selection and inventory distribution, with no reliable way to track which items were selling well. Instead, stores routinely received "dumb junk" rather than high-demand products, leading to both lost sales and excess, unsellable inventory. She described the stores as operating like "yard sale[s]" due to the lack of control over what merchandise was delivered.

152.    That same employee further reported that inventory tracking was largely manual, inaccurate, and burdensome for underpaid and inexperienced store staff, who were unable to manage Buy Online, Pick-Up In-Store ("BOPI") orders effectively. According to her, Five Below also lacked control over logistics, relying on third-party freight carriers that frequently mishandled or lost product in transit. When shrink numbers came back high, she recalled being instructed by supervisors to stop counting because the results were "coming back like shit."

153.    Another former employee, who worked at Five Below from 2016 to 2023, including in a District Manager role overseeing up to 25 stores, confirmed that the Company did not carefully select inventory for individual store needs. He reported that stores routinely lacked sufficient quantities of trend-right products, while being overstocked with items that did not sell, contributing to shrink and operational inefficiencies.

154.    The same former employee stated that Five Below lacked any strategy for staying on top of hot trends and consistently struggled to stock in-demand products. According to him, the Company would advertise items such as Squishmallows, but when customers arrived, they often faced limits on how many they could purchase or found that no Squishmallows were in stock at all. He explained that Five Below shipped as many as 20 cases to some stores but as few as three to others, effectively "creat[ing] demand but [having] no supply," due to widespread inventory control issues.

155.    He further reported that these same inventory problems extended to the Company's Five Beyond sections, which were frequently empty or understocked.

156.    Senior executives at Five Below, including Chief Retail Officer George Hill, were aware of these inventory problems. After a former employee raised concerns about inventory control issues with his Regional Director, the Regional Director instructed him to stop making weekly adjustments to store inventory. That former employee believed this instruction followed a discussion of the matter between the Regional Director and Hill.

157.    Another former employee similarly reported that his store had no "choice in what products it received." He worked as a Merchandise Manager at Five Below from October 2023 to March 2024, reporting to District Manager Steve Vareberg. In that role, he was responsible for store inventory and the setup of merchandise inside the store.

158.    He recalled that his store was sent pallets of inventory with instructions to "just sell it," regardless of whether the items were wanted by customers. As unsellable pallets piled up, the store reached capacity. That former employee requested that Vareberg stop sending pallets, explaining that the backroom was full, but Vareberg responded, "Nope, sell it. Too bad." He confirmed that his direct supervisor raised the same issue with Vareberg multiple times, including by email, but the problem persisted.

159.    He also reported that he was never provided documentation to compare what his store was supposed to receive with what it actually received. As a result, missing boxes went undetected.

160.    He further recalled that when his store conducted inventory counts, employees could see the numbers of items they were supposed to have. If there was any gap between those numbers and actual inventory on hand, employees were instructed to attribute the missing items to theft. That

directive came from Vareberg. The former employee confirmed that much of the supposed "gap" was actually the result of Five Below's poor inventory control, not theft. According to him, the Company-wide practice of labeling these discrepancies as "theft" or "shrink" meant that shrink encompassed products that stores never received or lost track of.

161.    Another former employee likewise reported that Five Below's senior leadership, including direct reports to Defendant Anderson, regularly received product inventory information. She, a Director at Five Below from January 2019 to February 2024, oversaw digital advertising and production projects and reported to a Senior Creative Director, who reported to John Caruso, Vice President, who in turn reported to Senior Vice President Felipe Zardo.

162.    She recalled that Chief Merchandising Officer Michael Romanko, who reported directly to Defendant Anderson, was responsible for the merchandising team, which selected products and determined trends. Zardo and James Ho also assisted with marketing.

163.    According to her, Romanko, Zardo, and Ho received weekly inventory reports, including when inventory was low for particular products. That former employee's knowledge came from participating in weekly discussions aligning store inventory with marketing and advertising.

164.    Those discussions regularly included Ho and Romanko. Based on her conversations with them and her knowledge of Company operations, she concluded that Anderson was also involved. She explained that Anderson, Romanko, Zardo, and Ho were all "deeply involved" in marketing strategy, and that "everything ran through Anderson." In meetings she attended, Ho, Zardo, and Romanko often indicated they had "talked to Joel," meaning the issues had been raised with Anderson. She stated that Anderson "knew about everything," including that the Company was frequently marketing and advertising products with limited inventory.

165.    Yet another former employee similarly reported that Five Below's inability to predict consumer trends led to serious inventory issues. He served as an Operations Manager of Fulfillment from February 2022 to August 2023, overseeing Five Below's e-commerce department at a distribution center. He managed three supervisors and between 40 and 80 employees responsible for packing and shipping online orders.

166.    He described the Company's trend monitoring as, at best, "underwhelming." He recalled that inventory became saturated because of inaccurate demand forecasting. For example, Five Below launched multiple versions of Squishmallows, but when demand dropped, warehouses were left with excessive unsellable inventory. He repeatedly asked management for permission to offload the inventory but was told to "sit on it." According to that former employee, during weekly calls with other managers, it became clear that all of the Company's distribution centers were struggling with the same problem.

167.    Another former employee also reported that the Company's inability to manage inventory was compounded by inaccurate forecasting. He was an Associate Director of Fulfillment Center Operations from March 2021 to December 2023, overseeing operations at one of Five Below's fulfillment centers, including supply chain and e-commerce activities.

168.    He explained that each day he reviewed a dashboard projecting orders from each of the Company's three distribution facilities. The allocations team, which fed data into the dashboard, dictated product flow and mix. However, inaccuracies in the dashboard forecasts contributed to inventory problems.

169.    He further reported that Vice President of Operations Jason Sheffer and general managers from the Company's fulfillment centers in New Jersey, Arizona, and Indianapolis participated in daily calls to discuss product allocations.

170.    That same former employee also noted that Five Below's corporate offices tracked historical online sales data using Tableau, which could even monitor product clicks. Despite this data, the Company had no coherent strategy for sourcing or selling in-demand products. He explained that his team frequently held excess inventory, forcing his warehouse to ship surplus products to retail stores at a loss or to liquidators.

171.    Collectively, the former employees' accounts establish a consistent theme: Five Below lacked the ability to identify consumer trends and reliably deliver the merchandise customers wanted. Its stores were burdened with excess unwanted inventory and persistent shortages of in-demand products. The Company also lacked adequate systems to track inventory or ensure accurate distribution. These issues were widespread across Five Below's operations, persisted throughout the Relevant Period, and were corroborated by multiple FEs.

172.    The Company's failure to execute its purported "trend-right" strategy directly harmed its financial performance. Contrary to Defendants' repeated assertions that Five Below's "trend-right" strategy was a driver of success, and their efforts to blame shrink for disappointing results, it was the Company's own operational failures that caused its revenue and earnings decline.

173.    On August 28, 2024, Five Below executives ultimately conceded to these persistent issues. The Company's Executive Chairman and co-founder, Defendant Vellios, acknowledged that "[o]ver the past few years, we lost some of that sharp focus on our core customers" and that Five Below "need[ed] to regain our speed and intensity in identifying and bringing in key trend items into our stores that delight our customers."

174.    On the same day, Defendant Bull, previously tasked with overseeing the Company's expansion, admitted that Five Below had "overexpanded our assortments across our worlds without the strict editing process of past years and without the key item focus that screamed value and

differentiation," further conceding that what the Company "got away from was the core part of our business around pre-teens and teens and really the mission for us in delivering an edited assortment, trend product, high quality at extreme value." He went so far as to state that the Company had "lost [its] way."

**Shrink**

175.   When the above structural issues within Five Below began negatively affecting the Company's financial results, Defendants refused to acknowledge the Company's operational missteps. Instead, they directed blame toward the public, asserting that shrink, an external, "societal" problem, was driving the Company's underperformance.

176.   On the June 1, 2023 earnings call, Defendant Anderson told investors that Five Below had "trued [up shrink] last year, and it had an impact on our fourth quarter [and] we are accruing at the higher rates this year and doing things on our part to mitigate shrink."

177.   On the subsequent earnings call, on August 30, 2023, Defendant Anderson again attributed pressure on Five Below's margins to shrink, explaining that "with us not changing the top line [i.e., sales], the 20 basis point decline [in operating margin guidance] is really the only change from the last quarter, and that pretty much is all based on the changes we're making with the assumption of shrink." He further stated, "[w]hile we are adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged." In other words, Defendants conveyed that shrink was the primary driver of the Company's lowered earnings guidance.

178.   During the August 30, 2023 call, Defendants explicitly tied Five Below's shrink issues to perceived national crime trends. In response to an analyst's question, Defendant Bull remarked: "I think you're all familiar with the recent media and videos that are out there where

retailers across the sector are experiencing increased levels of shrink and related crime incidents and we are not immune to this as we're finding out." Later, when asked again about the increase in shrink, Defendant Anderson explained: "[Y]ou've got several cities now which just simply aren't prosecuting below the $500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates."

179.    Similarly, on Five Below's November 29, 2023 earnings call for the third quarter of 2023, CFO Chipman claimed: "Gross margin decreased by approximately 190 basis points to 30.3%, as anticipated. This decline was primarily driven by recording actual shrink results for the stores that completed their physical inventories in August as well as recording the true-up of shrink reserves for the full chain, which we shared during our last quarter's earnings call."

180.    The following day, Defendant Anderson appeared on Fox Business with host Maria Bartiromo to discuss Five Below's earnings. When Bartiromo asked about shrink, noting that "what it really means, is theft," Defendant Anderson responded: "[w]e talked about theft in our second quarter call. Theft is real, it's impacting all retailers." He further stated that "this is a real societal problem and we've got to lean together with the politicians to figure this out."

181.    Even as Defendants began to reveal the Company's operational shortcomings on the March 20, 2024 earnings call for the fourth quarter of 2023, they continued to represent shrink as the primary cause of disappointing financial results. Defendant Anderson told investors that "[d]espite these strong sales results, earnings per share of $3.65 was at the low end of our internal expectations and can be fully attributed to higher-than-planned shrink."

182.    Defendants' false narrative attributing weakened financial performance to shrink reflects a broader industry tactic. A series of articles reported on the phenomenon, including a CNN article dated January 18, 2023 stating that:

Companies say these [theft] incidents have led to a spike in merchandise losses, known as shrink. . . . But the retail industry's own figures on shrink cast doubt on their claim that the problem is ballooning. Researchers say **retailers may be blaming theft for losses when they don't actually know the cause.**

. . . .

**It's also easier for companies and the public to blame theft for store closures and retail struggles than admit stores' over-expansion, strategy mistakes and customers abandoning stores for online shopping**, said Jonathan Simon, a criminal justice professor at UC Berkeley School of Law. "It's much more convenient if we can blame it on people we already consider reprehensible," he said.

183.    An August 10, 2023 CNBC report on the issue stated:

**Retailers who blame organized theft for lower profits could be overstating crime's impact to cover up internal flaws or self-inflicted problems**, CNBC has learned. During recent earnings calls, major companies have blamed disappointing bottom lines or shrinking margins in part on roving bands of organized gangs that ransack their shelves.

. . . .

"Shrink has been going up but sometimes **it's very difficult to unpack how much is down to theft and how much is down to internal retailer issues and stumbles**," Neil Saunders, a retail analyst and the managing director of GlobalData, told CNBC. "It is a problem, we know that, it does take money off margins, we know that, but **there's too much opacity in the way in which it's reported and it is being partly used as an excuse for generally bad performance**," Saunders said.

184.    The same outlet followed up with another article dated September 8, 2023, stating:

Over the last few quarters, more and more retailers have called out shrink as a drain on profits and blamed theft for those losses. But they have offered few details about how much inventory losses are actually costing them. Experts have said **some companies could be using crime as an excuse to distract from other operational challenges that drive shrink, such as poor inventory management and staffing issues.**

Companies that have disclosed shrink numbers and explained to investors how they're working to solve it show that they have a grasp on the problem, Sonia Lapinsky, a partner and managing director with AlixPartners' retail practice, told CNBC. **Others that loosely blame shrink and theft for plummeting profits without providing much more explanation may be trying to obfuscate internal issues**, said Lapinsky.

"Are you clearing way more inventory because you mis-planned it and you misbought it and that's what's really getting a bigger profitability hit?" said Lapinksy. "But because everybody's saying 'let's just blame the theft that's increased and that's out of my control,' let me tell the Street that that's why it's happening and not disclose what's really going on in operation."

185.    The following spring, NPR reported:

[C]rime became a common theme on retailers' typically dry quarterly earnings calls. Executives often mentioned "shrink" – inventory missing for one reason or another – as a factor behind declining profits.

. . . .

Crime data has yet to indicate a nationwide epidemic of theft, leaving us only to guess at the true scale of the problem.

. . . .

[A]nalysts surmised that *retailers also likely used crime as a cover for closures of underperforming locations and lackluster financial results, making up for shoppers' tightening budgets, for example, or a glut of unpopular products.*

186.    Analysts also observed that retailers often invoke shrink losses as a pretext for underlying financial problems. For example, in September 2023, S&P Global Ratings' analysts noted that they "believe some retail companies could be overstating the contribution of theft." Similarly, William Blair analysts stated in October 2023 that "[w]hile theft is likely elevated, companies are also likely using the opportunity to draw attention away from margin headwinds in the form of high promotions and weaker inventory management in recent quarters," and further observed that "[w]e also believe some more recent permanent store closures enacted under the cover of shrink relate to underperformance of these locations."

187.    Consistent with CNBC's reporting, Five Below disclosed little information regarding its actual shrink levels. Defendants never quantified the Company's total shrink expense in any quarter or year during the Relevant Period, nor did they identify what portion of shrink was

attributable to theft as opposed to inventory control and related issues. Instead, Defendants provided only opaque references to the amount by which shrink had increased from one period to the next. As a result, investors could not determine whether shrink in any given period amounted to $10 million, $100 million, or some other figure. This lack of transparency obscured the true financial impact of shrink and enabled Defendants to use it as a convenient and amorphous explanation, instead blaming supposed criminal theft for what in reality reflected inventory mismanagement or unsold merchandise.

188.    At the same time, Defendants coupled their narrative that shrink was the Company's principal challenge with assurances that they had implemented effective mitigation measures. For instance, on the June 1, 2023 earnings call for the first quarter of 2023, Defendant Anderson stated that "*we are . . . doing things on our part to mitigate shrink*," while Defendant Bull added that "*we're focusing on preventative measures around shrink*."

189.    On the August 30, 2023 earnings call for the second quarter of 2023, Defendant Bull claimed that he was personally leading a team "to focus on *operational mitigation efforts to counter the elevated shrink trends,*" and elaborated that the team was pursuing "enhanced technology, merchandise presentation, . . . register formats, policies and procedures."

190.    On the same call, Defendant Anderson asserted that mitigation efforts were already producing results, stating: "*We'd already mitigated some of the things from the 30 basis [point] increase from last year*. . . . The difference is . . . a year ago, we weren't doing anything about it. . . . *So all the mitigation efforts we are putting in just started*." He further assured investors, "*I see nothing but upside as we get past this shrink, put mitigation efforts in for that.*"

191.    On the November 29, 2023 earnings call for the third quarter of 2023, CFO Chipman reiterated that "*[a]s it relates to shrink, we are working on many initiatives throughout the*

*organization to help mitigate the anticipated increase we have forecasted*." On the same call, Defendant Anderson added, "*we obviously think our mitigation efforts are working*."

192.    Defendants' purported shrink mitigation efforts were presented as part of a broader scheme to reassure investors that shrink was the Company's primary obstacle and that proactive measures were underway to resolve it. Defendants emphasized that theft was Five Below's biggest issue and claimed the Company had adjusted its "business model" to address it, with a "dedicated team" led by then-COO Defendant Bull. In truth, these statements were misleading. Defendants failed to disclose, and in fact *actively concealed*, that Five Below's true problems lay in poor product selection, weak inventory control, and flawed allocation practices.

193.    Despite the misleading statements, analysts accepted Defendants' narrative that shrink was the central pressure on the Company's business and that mitigation efforts were underway. For example, William Blair reported on June 2, 2023 that "[i]n line with many of its peers, Five Below highlighted increased pressures related to shrink where the company recorded a one-time true-up." Credit Suisse, in its August 30, 2023 report, noted that Five Below joined "the long list of retailers embedding significant margin headwinds from shrink in their forward outlooks." Truist likewise attributed Five Below's weaker "bottom line" to shrink. UBS explained that the Company had lowered its earnings per share outlook "due in large part to a rise in shrink," while adding that Five Below "expects to take steps that will offset some of this impact," including "taking steps to mitigate the shrink." Wells Fargo described the Company as "[a]nother [s]hrink [c]asualty" but noted that management "sounds confident it[']s seen the worst of shrink." Finally, BofA Securities, in its November 29, 2023 coverage of Five Below's results, reported that the Company had "taken initiatives to mitigate shrink."

194.    As discussed herein, Five Below's management ultimately admitted, contrary to their repeated assertions that shrink was the cause of operational issues, that a "significant part of" the Company's "top-line challenges [were] self-inflicted from less-than-exciting product assortment and likely suboptimal pricing."

195.    During the March 20, 2024 earnings call, Defendants further acknowledged that the Company's efforts to control shrink, contrary to prior claims, were not "working." Defendant Anderson explained that the Company fell short of guidance because "prior expectations assumed that our mitigation efforts would result in a reduction of the shrink rate," which did not occur. He also noted that Five Below had only "tested many shrink mitigation initiatives" during the last two quarters of 2023, calling into question the extent of implementation.

196.    Former employees confirmed that shrink was not, in fact, the principal issue impacting Five Below. They reported that the Company did not take shrink mitigation seriously, largely because it was unwilling to increase staffing levels and payroll costs, which would have further compressed profit margins. Defendants' statements blaming shrink and claiming mitigation efforts were therefore attempts to attribute poor performance to external factors rather than internal failures.

197.    A former District Manager overseeing over a dozen stores through November 2023, stated that shrink headwinds represented only a minor part of Five Below's sales decline. The real problem, according to the former employee, was the Company's inability to stock trend-right merchandise.

198.    That same employee reported that the primary contributor to theft was self-checkout. The only measure Five Below implemented to address theft was to instruct one or two associates to help customers at self-checkout registers. He explained that this policy created additional

problems, as customers pushed back against employees attempting to assist them. He recalled that young, inexperienced store employees were unable to handle customer dissent. The Company continuously adjusted its checkout policies in response to complaints, but no other major measures were taken to combat shrink.

199.    That same former employee expressed confusion at Five Below's minimal efforts, noting that the Company continued to open stores equipped only with self-checkout registers. Shrink issues were compounded by the introduction of Five Beyond sections, which were visually difficult for employees to manage and often empty, creating further opportunities for theft.

200.    Another former employee, a former Merchandise Manager, reported similarly that while Five Below claimed to seek shrink prevention, employees and managers were given no tools, training, or strategies to do so. She explained that employees were required to sign a contract agreeing not to intervene in cases of theft.

201.    The former Store Operator and later District Manager reported that shrink was a lesser issue compared to inventory control problems. He noted that the only measure suggested for preventing shrink, having an employee assist customers at self-checkout, was ineffective due to chronic understaffing. Employees were also instructed not to intervene in shoplifting incidents.

202.    Yet another former employee, a District Manager responsible for the Midwest, reported that the only response to theft he recalled was the assisted self-checkout policy. However, implementation was difficult due to the Company's reluctance to increase labor costs. He explained that Five Below sought to reduce expenses and suppress wages, which prevented hiring employees capable of effectively managing inventory and customers. He described the allocation of resources, including labor and theft prevention, as a "free-for-all," noting that executives could have used shrink as a pretext to conceal inventory problems.

203.    Meaningful shrink mitigation would have required increased labor expenditures, which the Company refused to do. During the March 20, 2024 earnings call, Defendant Anderson acknowledged the tradeoff between labor and shrink: "[I]t doesn't do us much good at the operating margin level if we have to take up labor by 30 [basis] points just to reduce shrink by 30. So it's a little bit of a balancing act of how much labor can you put in to reduce shrink." This statement revealed that the Company was unwilling to devote necessary labor resources, contrary to Defendants' repeated representations touting shrink mitigation.

204.    Five Below's implementation of self-checkout further reduced labor costs but increased theft. The Company apparently considered the labor savings worthwhile despite higher shrink, demonstrating that it was not committed to addressing the issue substantively.

205.    Low staffing contributed to shrink beyond the self-checkout issue. A UBS analyst report dated July 21, 2024, summarized an interview with a former Five Below executive, stating that "[t]he expert believes recent shrink issues are not solely attributable to more self-checkout registers. He believes lower staffing levels have also been a contributing factor over time."

206.    Critically, despite Defendants' claims of taking multiple measures to mitigate shrink, former employees of Five Below consistently reported that the only efforts implemented were limited changes to self-checkout, which were inconsistently applied and constrained by the Company's refusal to increase labor. At bottom, Defendants' shrink mitigation efforts were not serious. Shrink was not a major concern but rather a secondary issue used to deflect attention from Five Below's operational failures.

**Five Below's Expansion Strategy**

207.    Defendants also made misleading statements and omissions concerning Five Below's Triple-Double plan, failing to disclose to investors and the public any problems or adverse

consequences arising from its implementation. Throughout the Relevant Period, Defendants repeatedly touted the plan, omitting any acknowledgment of the toll it was taking on management or the internal distractions it was causing.

208.    For example, during the November 30, 2022 earnings call for the third quarter of 2022, Defendant Anderson stated: "[W]e're still on track for the longterm Triple-Double goals. . . . We are gaining momentum going into '23 and expect that to continue to grow."

209.    On the March 15, 2023 earnings call for the fourth quarter of 2022, Defendant Bull declared: "[W]e plan to open 200 new stores [in 2023] and expect to end the year with 1,540 stores or unit growth of approximately 15%." On the same call, Defendant Anderson added: "[T]he process -- we streamlined it in several different ways to be able to execute more leases in a faster timeline more per month. We are expanding the types of centers we're going into." Anderson reiterated this forecast on the June 1, 2023 call.

210.    On August 30, 2023, Defendant Bull stated that "[we] feel extremely confident around the Triple-Double vision."

211.    During the November 29, 2023 earnings call for the third quarter of 2023, Defendant Anderson said: "We remain on track to achieve the goal of opening over 200 stores [in 2023]. . . Our real estate teams have built a strong pipeline of new stores for 2024 and have also started working on 2025 stores."

212.    At the January 8, 2024 ICR Conference, Defendant Anderson elaborated:

Now I'd like to update you on the Triple-Double strategy. As you recall, we shared the strategy with you back in March of 2022, and it was very simple. We were going to triple our stores by 2030, we're going to double our earnings and sales by 2026 -- 2025. Today I will update you on exactly where that vision stands.

. . . As it relates to tripling our stores by 2030, I repeat, nothing has changed. We still . . . expect to triple our stores by 2030. We opened 1,000 stores in the last seven years. We're going to open 2,000 stores in the next seven years.

213.    At the same conference, CFO Chipman stated: "So the first pillar is our store growth plan and store expansion. As I just mentioned, we opened a record 204 net new stores in fiscal year '23, and we'll grow that to between 225 and 235 in fiscal '24 and grow again to 250 to 270 by the end of fiscal 2025." Neither Anderson nor Chipman disclosed the internal strain or management distractions caused by the plan.

214.    On the June 5, 2024 earnings call for the first quarter of 2024, Defendant Anderson again emphasized store growth as the "first pillar" of Five Below's strategy, stating: "Our first pillar is store expansion. [We have] over 1,600 stores currently and a road map to 3,500 Five Below locations nationwide by the end of 2030. . . . *We are confident in our path to achieve approximately 230 new store openings this year and have already built a strong pipeline for 2025*." He added: "our focus on executing our store growth plans with excellence is unwavering." He gave no indication that the Company was contemplating slowing store expansion.

215.    Similarly, at the June 12, 2024 Oppenheimer Conference, Anderson remarked: "[I]t's also important we don't lose sight of the long term and the Five Below growth story and that remains solidly intact and there are several components to it. One, it's all about a strong new store growth pipeline, which we reiterated several times on our [Q1 2024] call. It's about the Five Beyond expansion continuing . . . . [T]he long-term growth of Five Below is something I am very excited about and we continue to pursue."

216.    Just months later, however, the Company began to walk back these expansion goals, acknowledging persistent issues with the plan. Defendants further admitted that the Triple-Double strategy distracted management from other business priorities, including its trend-right merchandise strategy, and was overly aggressive.

217.    As Five Below's financial results declined and execution difficulties mounted, it became clear that the Anderson-led expansion was failing. This was confirmed when Defendant Bull announced on August 28, 2024 that Five Below would "moderat[e] [its] store growth for 2025."

218.    Former employees corroborated that the expansion strategy created problems throughout the Relevant Period.

219.    According to one former employee, a District Manager from February 2016 through July 2024, sales at existing stores consistently dropped when new stores opened nearby, but Five Below never adjusted the sales targets for those comparable stores.

220.    The former Associate Director of Fulfillment Center Operations, reported that the expansion plan was widely viewed as overly aggressive. Concerns were raised internally as early as 2021, including on calls with senior leadership such as Jason Scheffer, Rich Tannenbaum, and Defendant Bull.

221.    Other former employees described specific issues with new stores. One, a former Store Operator, explained that the Triple-Double strategy was "totally unrealistic" due to chronic understaffing.

222.    Another, a former District Manager, recalled one new store in his area opening with an entire section left empty. Staff had to "fluff" the space to cover the gap, but they lacked appropriate product from the warehouse, and his request to transfer merchandise from another store was denied.

223.    Yet another former District Manager reported that Five Beyond sections often remained empty for months after opening. In some cases, it took over a year for stores to receive Five Beyond inventory, during which banners were posted claiming products were "on their way."

Sometimes outdated merchandise was shipped to fill space, but stores had no control over what they received.

224.    That same former employee further noted that stores began receiving new Five Beyond and related products only a few weeks before hitting the fifteen-month mark, when they qualified as "comp stores" for inclusion in same-store sales figures. That former employee's supervisor, Alferez, openly discussed this tactic on internal calls.

225.    These practices suppressed early sales at new stores, creating the false appearance of stronger same-store sales growth.

226.    As discussed herein, the Company already struggled to stock trend-right merchandise at existing stores. Five Below was unprepared to sustain its aggressive expansion and ultimately scaled back following Anderson's departure.

## The Truth Emerges

227.    Investors began to learn the true state of Five Below's business on March 20, 2024, when the Company announced its fourth quarter 2023 results after market close. Five Below disclosed earnings per share ("EPS") of $3.65 – 3.5% ($0.13) below analysts' consensus estimate, revealing that performance was deteriorating. Defendants, however, continued to misrepresent the cause, attributing the decline to increased shrink while omitting that the real driver was the Company's inability to execute its trend-right strategy.

228.    In the accompanying press release, Defendant Anderson stated: "[T]he benefit of strong sales performance to our profitability was offset by higher than anticipated shrink headwinds, resulting in earnings at the low end of our guidance range."

229.    On the earnings call the same day, Anderson misleadingly claimed that the EPS shortfall was "fully attributed to higher-than-planned shrink."

230.    While continuing to wrongfully shift blame to shrink, Defendants attempted to reassure investors by emphasizing mitigation efforts. On the March 20 call, Anderson downplayed shrink as not unique to Five Below, instead characterizing it as "industry-wide and a societal problem that accelerated over the last year," while also claiming the Company had specifically taken steps to combat it.

231.    Despite these explanations, the reported results partially exposed broader issues specific to Five Below, including problems with new store openings under the Triple-Double plan. For example, a Gordon Haskett analyst highlighted declining "new store productivity" (NSP), the measure of sales generated by new stores in their first year compared to existing stores. The analyst noted that Five Below's NSP had worsened. Anderson admitted that while in "earlier years" NSP was in the "90s," it had since fallen to the "high 80s," then the "upper 80s," and most recently the "mid-80s." To blunt the admission, he asserted that prior higher productivity reflected pre-pandemic "marketing campaigns when we opened new stores," which the Company no longer conducted.

232.    Analysts reacted strongly to the disappointing results. Several downgraded the stock or cut price targets, including JP Morgan, which lowered its rating from "Overweight" to "Neutral."

233.    Guggenheim, which had expected stronger results, conceded it "couldn't have been more wrong." It noted that both the results and forward guidance missed forecasts and cited "meaningful labor investments designed to curtail shrink" as a drag on guidance, explaining that "FIVE is leaning into associate-assisted, rather than self-checkout, including receipt checking, which was piloted in 20 stores in the 4Q."

234.    Craig-Hallum called the guidance miss "among the biggest misses in the decade-plus the company has been public," while noting shrink mitigation would "involve increased

staffing efforts and a shift away from self-checkout that will drag [costs] higher." Evercore ISI lowered its target from $240 to $230, warning that "shifting into employee assisted checkout/ security/ and mitigation efforts should reduce theft, but with higher wage/ longer checkouts EBIT margin recovery likely constrained this year and next."

235.    UBS Securities likewise cut its target from $270 to $245. Its analysts began by observing the earnings release would "sure to spark an intense debate" about the Company's investment merits. Before even addressing shrink, UBS emphasized that "the company noted that its new-store productivity was around 85% for FY'23. This is lower than the historical 90%-100% the company has achieved." UBS concluded that "it was likely that the company's NSP productivity is simply going to moderate as it further saturates its addressable market."

236.    Analysts also remarked on the contrast with management's tone at the January 8, 2024 ICR Conference. Wells Fargo noted on March 20, 2024: "FIVE provided a surprisingly disappointing update given a generally upbeat tone at ICR." In reality, the weak performance stemmed largely from the Company's failure to execute its trend-right strategy.

237.    Nonetheless, Defendants' insistence that the EPS decline was "fully" due to shrink, their claims of mitigation efforts, and their characterization of shrink as an industry-wide phenomenon softened investor concern. For example, Wells Fargo Securities reported being "disappointed with the management of guidance" but emphasized that Five Below was "not the only company with a shrink problem and the issue seems to have peaked." Telsey Advisory Group similarly expressed confidence that mitigation measures would "work as the year progresses" and opined that "the shrink pressure will prove somewhat transitory."

238.    Despite these reassurances, the March 20, 2024 announcement and earnings call triggered a sharp market reaction. On March 21, 2024, Five Below's stock price fell by $32.18 per share, closing at $176.79 – a decline of more than 15% from its prior-day close of $208.97.

239.    Again, on June 5, 2024, Five Below reported first quarter 2024 results that Defendant Anderson himself described as disappointing, and which Truist analysts characterized as "painful." Analysts also showed increasing skepticism toward the Company's explanations for its downturn.

240.    The Company disclosed that comparable sales decreased by 2.3% year-over-year, operating income declined 14.6% from $42.4 million to $36.2 million, net income fell 16% from $37.5 million to $31.5 million, and diluted EPS dropped 15% from $0.67 to $0.57.

241.    On the associated earnings call, Defendant Anderson attempted to blame macroeconomic trends, stating that "consumers are feeling the impact of multiple years of inflation . . . and are therefore far more deliberate with their discretionary dollars." At the same time, he conceded that an unfavorable product mix contributed to the results, acknowledging "declining sales and older merchandise trends led by Squishmallows." This partial admission confirmed that Five Below's inability to stock trend-right products, its failure to mitigate shrink as promised, and execution issues with its expansion strategy were the true drivers of performance decline.

242.    Analysts pressed management on these explanations. A Barclays analyst noted that "[w]e've obviously seen declines in discretionary demand at many of your peers," but observed that "up until this quarter, Five had outperformed a lot of those peers," while "that gap is narrowed a lot this quarter." Anderson conceded it had "proven harder for us to lap some of the big trends from last year," and admitted "that's probably been the biggest difference from last year's

outperformance to this year." This was the first partial revelation that trend-right failures were driving declining results.

243.    A Truist analyst asked whether the problems might be "self-inflicted," pointing out that "the [other] off-price retailers are performing very well" and questioning whether Five Below's "product[]s [had] gotten a little bit stale." Anderson resisted, arguing that peers sold more apparel, and pointing instead to negative comps at other dollar stores such as Dollar General and Dollar Tree.

244.    Analysts also asked whether competitive pressures were to blame. A UBS analyst questioned whether the slowdown was "caused by simply increased competition, whether it's some new Dollar store competitor or inexpensive Asian direct sellers or marketplaces that are gaining increased traction in the United States?" Anderson sought to deflect, citing "quarterly research" showing Five Below remained a top destination for "fun, trend-right, high-value items," and insisting that proximity to competitors had not worsened performance. He also argued that if competition were to blame, the sales decline would not have appeared "in the middle of the quarter."

245.    A Goldman Sachs analyst spotlighted the problem of "cannibalization" from the Company's aggressive expansion strategy. Anderson admitted cannibalization had increased from "in the 50 basis points" pre-COVID to "in the 80 to 100 basis points annually," but insisted it was not a "contributing factor" to the quarter's sales decline.

246.    Anderson closed by once again framing the issue as industry-wide, claiming: "our core customer, they are clearly prioritizing needs over wants, and that had a big impact on our performance in Q1."

247.    Analyst reaction was negative, with several rejecting the Company's attempt to pin all of its problems on macroeconomic trends.

248.    Truist, for example, reported that "while the macro has clearly been a headwind…, the company also saw incremental weakness from some of their older products like Squishmallows." After discussions with management, Truist reported that executives admitted it was a "fair assumption" that "there just isn't a lot of 'new' and 'exciting product' right now in the stores." This further confirmed that trend-right failures were a primary cause of underperformance.

249.    Analysts also noted that Five Below's problems appeared company-specific. Truist highlighted that "a lot of companies that tend to co-locate with Five Below, like the off-price retailers, are performing very well," pointing to Ollie's "strong quarter" and Costco's report that discretionary goods were its "best-selling products" that quarter.

250.    The same report emphasized that the sales slowdown coincided with store-related changes, including the expansion of Five Beyond (with higher price points), shrink mitigation measures, and a shift to associate-assisted checkout, all of which "may not have been a smooth process, based on various industry sources." Truist concluded that "the store is currently more 'stale' than it has been in quite some time."

251.    Wells Fargo similarly expressed surprise that "business has slowed this much with more mixed results elsewhere," and cut its price target nearly 20%, from $180 to $145.

252.    UBS predicted the market would be skeptical of Defendants' macro-based explanation, stating that "[a]t least some will assign the explanation to a combination of rising competition, some give-back of the outperformance from the last few years, the lack of newness in the product assortment and some degradation of the company's unit economics."

253.    Still, some analysts offered limited optimism. Telsey Advisory Group concluded that "the stock is close to a bottom, with the bad news reflected in the share price," and predicted

that "the company's focus on merchandizing and operational improvement [will] boost performance."

254.    Following the announcement, Five Below's stock price dropped from $132.79 on June 5, 2024, to $118.72 on June 6, 2024 – a one-day decline of $14.07, or 10.6%. The prediction that the stock was "close to a bottom," however, proved incorrect.

255.    The Relevant Period concluded on July 16, 2024, when Five Below shocked the market by announcing, through a press release attached to a Form 8-K filed with the SEC, that Defendant Anderson was resigning as CEO, President, and member of the Board, effective immediately. Defendant Bull, the Company's Chief Operating Officer, was appointed interim CEO and President.

256.    In the same press release, the Company disclosed second quarter-to-date results that revealed comparable sales had already declined 5% year-over-year and were expected to decline between 6% and 7% for the quarter overall. The Company further projected diluted earnings per share between $0.53 and $0.56, representing up to a 19% reduction from the guidance it had issued only six weeks earlier.

257.    Analysts and investors reacted negatively, issuing downgrades and lowering price targets. Analyst reports, based on direct communications with management, made clear that the Company's problems were structural and not simply the result of macroeconomic conditions or shrink, as Defendants had previously asserted.

258.    JP Morgan cut its price target by nearly 29%, from $122 to $87, and published commentary from discussions with management in which a Company executive admitted that Five Below had "strayed" from its established playbook and needed to return to (i) trend-right merchandising, (ii) extreme value pricing, and (iii) a consistent, enjoyable in-store experience.

259.    JP Morgan further reported that management identified several additional issues beyond macroeconomic pressures, including poor merchandising, a stale product assortment, and declining sales of trend-right products such as Squishmallows.

260.    Guggenheim lowered its price target more than 24%, from $165 to $125, emphasizing that Five Below should not have been as vulnerable to macroeconomic pressures as results suggested. Guggenheim reported that management acknowledged the need to refocus on extreme value and a differentiated shopping experience, while also raising concerns about the impact of Five Beyond and the elimination of self-checkout.

261.    Barclays downgraded Five Below from Overweight to Equal Weight, concluding that company-specific issues—including merchandising missteps and weakened value offerings—were central to the Company's underperformance.

262.    Morgan Stanley similarly downgraded Five Below, explaining that its prior thesis—based on unit growth, merchandising execution, and benefits from consumer trade-down—had been undermined by the Company's recent results.

263.    William Blair downgraded the stock to Market Perform, predicting the Company would scale back expansion plans due to structural headwinds and management's admission that recent demand pressures were largely self-inflicted.

264.    Deutsche Bank also downgraded to Hold, reporting that management itself acknowledged the Company's product assortment was uninspired, pricing was suboptimal, and that correcting these "self-inflicted" issues would take time.

265.    Following the news, Five Below's stock price collapsed from $102.07 on July 16, 2024, to $76.50 on July 17, 2024, a single-day decline of more than 25%, marking the Company's lowest closing price since June 2018.

266.    In total, from its Relevant Period high of $217.18 on April 11, 2023, Five Below's stock price plummeted 64%, wiping out more than $7.7 billion in shareholder value.

## Post Relevant Period

267.    The corrective disclosures of March 20, 2024, June 5, 2024, and July 16, 2024 collectively revealed that Five Below failed to stock trend-right products, misleadingly attributed its financial deterioration to shrink, and pursued an overambitious expansion strategy that exceeded both operational capacity and consumer demand. In the months following these disclosures, management provided further admissions that underscored the structural nature of the Company's problems.

268.    Less than six weeks after the sudden resignation of Defendant Andersen, Five Below announced its second quarter 2024 results on August 28, 2024, reporting further year-over-year declines. Comparable sales fell 5.7%, and operating income, net income, and diluted earnings per share each declined compared to the second quarter of 2023.

269.    On the earnings call that day, management acknowledged that the Company's problems were largely self-inflicted. Defendant Vellios admitted that the Company had lost focus on its core customers in recent years and pledged a strategic and operational refocus to restore value, improve the shopping experience, streamline operations, and prioritize speed in identifying and stocking trend-right products.

270.    Then-Interim CEO Defendant Bull expanded on these admissions, conceding that the Company had overexpanded its assortments without proper editing or focus, strayed from its core customer base of pre-teens and teens, and failed to deliver high-quality, trend-right products at extreme value. He further emphasized that value required a balance of price, quality, and trend, and that Five Below had failed to deliver on this balance.

271.    These admissions further confirmed the trend-right failures that had first been partially revealed in the June 5 and July 16 disclosures.

272.    Bull also acknowledged that declining results required scaling back the Company's assortment and expansion plans. He announced that Five Below would significantly reduce product offerings, return to pre-pandemic assortment levels, reevaluate its store operating model, and moderate its store growth from the previously announced 270 openings for 2025. The Company also committed to revising its Five Beyond offerings.

273.    Management further admitted that the Triple-Double growth strategy was too aggressive and had distracted leadership from executing the trend-right strategy. Bull explained that the plan's ambitious targets created organizational strain and forced management to focus on growth metrics at the expense of product innovation and customer experience.

274.    Bull also conceded that these problems were not new but had developed over several years, confirming that the issues had been present throughout the Relevant Period.

275.    Analysts interpreted the August 28, 2024 disclosures as further evidence that Five Below was scaling back its prior growth strategy and attempting to return to its core operations. William Blair titled its report "Going Back to the Basics," while Evercore ISI emphasized that the Company was now narrowing its focus on product, pricing, and customer experience.

276.    On December 4, 2024, alongside its third quarter earnings release, the Company announced that it had appointed Winnie Park, CEO of Forever 21 since 2022, as its new CEO effective December 16, 2024, bypassing Bull and other existing executives. The move signaled recognition that substantial new leadership was required to address the Company's operational and strategic failings.

277. On the same earnings call, management reiterated that trend-right failures persisted. Bull acknowledged that Five Below had not yet succeeded in restoring its product mix, stressing the need to focus on high-quality, trend-right, extreme-value products targeting its core demographic. Vellios similarly acknowledged that the Company still had significant work to do to streamline its assortment, enhance newness, and reestablish its reputation for delivering trend-right products.

278. Management also revealed that the Company's work-from-home policy, in effect throughout the Relevant Period, had hindered collaboration essential to identifying and capitalizing on trends. The Company mandated a return to office in mid-2024, and management reported that in-person collaboration had already improved innovation and trend execution.

279. The Company further admitted that excessive SKU expansion during the Relevant Period diluted its ability to deliver trend-right products. On August 28 and December 4, 2024, Bull explained that SKU counts had risen well above pre-pandemic levels, creating complexity and crowding out innovation. He stated that management would reduce SKUs by up to 20% to create space for new, trend-driven products.

280. Analysts reinforced that these problems had existed throughout the Relevant Period. Reports from Craig-Hallum, Wells Fargo, and BNP Paribas each identified the Triple-Double strategy, merchandising missteps, SKU overexpansion, shrink management, remote leadership, and overemphasis on aggressive growth targets as key drivers of Five Below's operational failures.

## DEFENDANT'S FALSE AND MISLEADING STATEMENTS

281. During the Relevant Period, Defendants made materially false and misleading statements and omissions by: (i) promoting the Company's "trend-right" strategy while concealing its execution failures; (ii) misrepresenting and omitting the Company's inventory management

deficiencies; (iii) attributing disappointing financial results to shrink when, in fact, shrink was not the primary cause; (iv) misrepresenting the effectiveness of purported shrink mitigation measures; and (v) touting the Triple-Double plan while failing to disclose that it diverted management's focus from the trend-right strategy and contributed to underperformance at the store level.

### Defendants' False and Misleading Statements Regarding Five Below's Trend-Right Products and Ability to Capture Customer Demand

282.    Throughout the Relevant Period, Defendants made materially false and misleading statements by touting Five Below's "trend-right" strategy and purported ability to quickly identify and stock trending, in-demand products. These statements were detailed and emphasized not only the distinctiveness of Five Below's business model, but also the Company's claimed focus, methods, and success in delivering "trend-right" products to its shelves and converting them into sales growth.

283.    In periodic filings with the SEC, including Form 10-Ks and 10-Qs issued during the Relevant Period, Five Below described itself as a "specialty value retailer offering a broad range of trend-right, high-quality merchandise" and stated that the "***principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products.***" In the majority of its press releases issued during the Relevant Period, the first sentence began with the phrase, "the trend-right, high-quality extreme-value retailer." On quarterly earnings calls, including the Q3 2023 call, Defendant Anderson similarly represented that "delivering WOW product is who we are and what we do and is key to our success." Thus, "trend-right" was consistently portrayed as central to Five Below's business identity and growth strategy.

284.    These statements were materially false and misleading because they misrepresented, or omitted to disclose, significant problems with Five Below's (i) identification and acquisition of

"trend-right" products; and (ii) inventory control and management, which resulted in empty shelves, excess unsellable merchandise, and product loss.

285.    On the November 30, 2022 earnings call, Defendant Anderson touted the "great progress" Five Below had made "on several initiatives in the third quarter," and assured investors that the Company was "in a great position for the fourth quarter." Anderson further represented: "***Our stores are stocked and ready with an amazing assortment of value products that promises to delight our customers. . . .*** [W]e're also excited for ***Five Beyond to provide new and extreme value products in different categories.***" Defendant Bull added on the same call: "***[o]ur teams continue to move quickly to adjust to changing customer preferences.***"

286.    On January 9, 2023, at the ICR Conference, Defendants Anderson and Bull participated in a Q&A session with Citigroup analyst Paul Lejuez. During that exchange, Anderson declared: "[I]t was a very good holiday. ***Trends were strong***, Squishmallows, Slime Lickers, Hello Kitty. And I think that's something that – I've been here eight years now, ***we've really got a good cadence with those [trends], how to get into them, how to get out of them.***"

287.    At the same ICR Conference, in response to a question regarding Five Below's ability to capitalize on new trends, Anderson emphasized: "[I]t seems like we're always talking about trends. And I think it all goes back to '17 with that [fidget] spinner year. . . . But from the beginnings of those times to now, it's really – it's kind of part of the secret sauce of Five Below. And it's kind of in our DNA, and it's not only about getting into a trend, but also knowing how to land the plane and get out of it. . . . ***And we're pretty nimble and quick.*** There's not a lot of bureaucracy at Five Below. ***When we identify something, we move really quick to get that in the store, test it and then push it out to the stores***." Defendant Bull echoed these remarks, stating: "The other thing with the trends too is, again, as Joel mentioned, we love trends, that's what we're all

about. It's really kind of the mindset that we have around those. We deal with this all the time. The two keys is they do help drive traffic and they also bring in new customers. So we continue to see that. And that's really powerful for the growth of the brand as we continue to do that. And as some fall off, although Squishmallows has been out there for a few years, we saw the introduction of new ones come on. And that happens every year. So you're going to see that continuing."

288.     On the March 15, 2023 earnings call reporting Q4 2022 results, Defendant Anderson further emphasized: "[W]e are passionate about sourcing an incredible trend-right assortment for our customers . . . . **We stay on top of hot trends and swiftly move to capitalize on them**. . . . The flexibility of our model . . . is unique and enables **swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends.**"

289.     In the Company's Relevant Period Form 10-Ks, issued March 16, 2023 (for fiscal year ended January 28, 2023) and March 21, 2024 (for fiscal year ended February 3, 2024), Defendants continued to tout Five Below's trend-right capabilities, representing that:

   a.   "**We monitor trends** in the ever-changing tween and teen markets and **are able to quickly identify and respond to trends.**"

   b.   "**We deliver an edited assortment of trend-right as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness** . . . ."

   c.   "We monitor trends in our target demographic market, historical sales trends of current and prior products and the success of new product launches to ensure that our merchandise is relevant for our customers. **We have a highly planned merchandise strategy focused on trend-right** and everyday products supplemented by selected opportunistic purchases from our vendors **to drive traffic and therefore offer our customers a consistently exciting shopping experience.**"

   d.   "The **principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products**…"

290.    On June 1, 2023, in a press release announcing Five Below's first quarter 2023 results, Defendant Anderson stated:

> We are pleased with our first quarter results that were in line with our outlook highlighted by a 3.9% comp transaction increase. *While our customers face multiple macro headwinds, we continue to be there for them, flexing our offering to bring them the Wow products they need and want. Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype*. . . . Looking to the rest of the year, we remain focused on playing offense to drive increased market share. We now plan to open a record 200-plus new stores and complete over 400 conversions to the new Five Beyond prototype in 2023 while building a strong pipeline of new stores for 2024. With the headwinds of the pandemic moderating, combined with our continued experience and efficiency-based initiatives, we believe we are well-positioned to continue our high growth.

291.    On the August 30, 2023 earnings call discussing second quarter 2023 results, Defendant Anderson stated: "Five Below's merchants persistently pursue trends [with] newness and value, both in the United States and across the globe." He further represented, "*we can quickly capitalize on a trend.*"

292.    Similarly, in Five Below's August 30, 2023 press release announcing second quarter 2023 results, Defendant Anderson stated:

> As we look to the second half of the year, *our merchants have sourced a terrific line-up of fresh, trend-right product* at outstanding value for the holiday season. *While we are adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged.* We will continue to play offense on sourcing amazing product, *capitalizing on an improved supply chain*, opening a record number of new stores, and executing on *the continued success of our Five Beyond store format*.

293.    On the November 29, 2023 earnings call for the third quarter of 2023, Defendant Anderson stated: "*[o]ur merchants have sourced . . . fresh and trend-right products at outstanding values.*" He continued, "in summary, our teams are focused on delivering incredible value, trend-right products."

294.    In Five Below's November 29, 2023 press release announcing third quarter 2023 results, Defendant Anderson further stated:

> We are very pleased with our results and operational execution in the third quarter. We exceeded our guidance for sales, comparable sales and EPS, as our value offering resonated with customers and *we effectively capitalized on multiple trends*. We opened a record 74 new stores in the third quarter and are on track to open over 200 new stores for the year. We have also successfully converted over 400 stores to our new Five Beyond format, ending the third quarter with approximately 50% of our comparable store base in this format. We entered the all-important holiday quarter *ready to Wow our customers with an outstanding assortment* of gifts and stocking stuffers at incredible value. *We are well positioned to execute this holiday season and deliver on our goals for the year*.

295.    On January 8, 2024, during Five Below's ICR Conference presentation, Defendant Chipman represented on behalf of the Company: "*Our merchants continue to innovate on the assortment* not only during the holidays, but *are bringing new and innovative things to [Five Beyond] . . . . Five Beyond conversions drive traffic, they elevate sales in the overall box and that includes both Five Below and Five Beyond products.*" The Company's accompanying conference presentation slides reinforced these assertions, boasting about its Five Beyond strategy:



296.    On the March 20, 2024 earnings call for the fourth quarter of 2023, Defendant Anderson stated that the Company's "buyers scour the globe to bring our customers the value, trends, wow and newness that keep them coming back to Five Below." He further represented that the "*flexibility of our model with our 8 worlds is unique and enables our teams to quickly introduce trend-right relevant products to our customers*."

297.    On the June 5, 2024 earnings call for the first quarter of 2024, Defendant Anderson asserted: "*chasing trends has always been a strength of ours*. And *we will continue to quickly identify and capitalize on trends, bringing them in-store quickly* . . . ." He also emphasized that the Company's "merchants remain passionate and are committed to bringing *the best trend-right amazing value products to our customer, while newness are part of our DNA, and I am really*

*pleased with the latest trends they have identified*." Anderson added that the Company's "merchants are definitely *looking at new trends, chasing trends, finding new ways to drive footsteps.*"

298.    The foregoing statements were materially false and misleading when made. By speaking about Five Below's ability to identify and source trend-right products, Defendants assumed a duty to provide full and accurate disclosure. Instead, Defendants concealed that, throughout the Relevant Period, the Company was increasingly unable to execute its purported "trend-right" strategy, particularly in identifying, sourcing, and stocking in-demand products. As Defendants later admitted, Five Below had "got away from [] the core part of [its] business," "overexpanded…without the strict editing process," and now "need[s] to regain our speed and intensity in identifying and bringing in key trend items." Defendants also acknowledged that product selection had become stale, lacked "newness" and "wow," suffered from overbreadth, and required a drastic reduction in SKUs to return to prior levels of performance.

299.    Former employees corroborated these admissions, confirming that, contrary to Defendants' representations about trend execution: (i) Five Below lacked any reliable strategy for sourcing and selling in-demand products; (ii) the Company faced severe problems allocating the limited "in-demand" products it did obtain, due to inadequate inventory and sales tracking systems; (iii) the Company rarely purchased products in correct quantities; and (iv) rather than curating trend-right merchandise, the Company simply shipped whatever inventory remained in its warehouses, leaving stores cluttered with unsellable "dumb junk." As a result, stores were overstocked with low-demand products, which were sold at a loss or discarded, while consistently lacking in-demand items, frustrating customers. Likewise, contrary to Defendants' claims, the Five Beyond sections often contained little to no merchandise, sometimes for a year or more.

300.    The statements identified herein were also misleading because Defendants knew or were reckless in disregarding that the Company had no meaningful system for identifying or executing on trends. Further, the Triple-Double plan, far from fueling growth, was "too aggressive and put a tremendous amount of pressure on the organization," impairing the Company's ability to focus on delivering trend-right products and amplifying value.

**Defendants' False and Misleading Statements Regarding Shrink**

301.    When Five Below's inability to respond to trends and provide in-demand products began materially impacting sales, Defendants did not acknowledge or correct the problem. Instead, they misleadingly shifted blame to customers, claiming that "shrink" (i.e., retail theft) explained the Company's disappointing performance.

302.    Defendants began this strategy no later than on the Company's March 15, 2023 earnings call for the fourth quarter of 2022, when they first laid the groundwork to attribute poor results to shrink. On that call, Defendant Bull stated the Company experienced "***higher-than-expected shrink***," and that "***[o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021***."

303.    On the June 1, 2023 earnings call for the first quarter of 2023, Defendant Anderson claimed that Five Below had "trued [up shrink] last year, and ***it had an impact on our fourth quarter*** [and] ***we are accruing at the higher rates this year*** and doing things on our part to mitigate shrink." While emphasizing shrink, both Anderson and Bull represented that the Company's guidance fully incorporated shrink's effects, effectively creating a buffer that deflected responsibility from the Company's failing trend-right execution and inventory controls.

304.    On the August 30, 2023 earnings call for the second quarter of 2023, Defendant Anderson again blamed shrink, explaining that "with us not changing the top line [i.e., sales], the

20 basis point decline [in operating margin guidance] is really the only change from the last quarter, and that pretty much *is all based on the changes we're making with the assumption of shrink*." Anderson reiterated, "*[w]hile we are adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged*."

305.    On the same call, Defendants further deflected attention from execution failures by explicitly attributing the problem to crime. Defendant Bull told investors, "I think you're all familiar with the recent media and videos that are out there where retailers across the sector are experiencing increased levels of shrink and related crime incidents and *we are not immune to this as we're finding out.*"

306.    Later on the same call, Defendant Anderson continued to inappropriately shift blame, claiming: "And so, where is it coming from? It's coming on all angles. And you've got several cities now which just simply aren't prosecuting below the $500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates. And we watched Target and we watched Wawa exit Center City. And so while I don't think we're yet at that extreme of closing Five Below stores there, these are the type of mitigation strategies that will be included as we consider what to do if we don't see things improve."

307.    On Five Below's November 29, 2023 earnings call for the third quarter of 2023, Defendants again attributed declining financial results to shrink. CFO Chipman reported: "Gross margin decreased by approximately 190 basis points to 30.3%, as anticipated. *This decline was primarily driven by recording actual shrink results for the stores* that completed their physical inventories in August *as well as recording the true-up of shrink reserves for the full chain*, which we shared during our last quarter's earnings call."

308.    The next day, on Fox Business's "Mornings with Maria," Defendant Anderson reiterated this narrative. When asked about shrink, "and what it really means, is theft," he responded: "[w]e talked about theft in our second quarter call. Theft is real, it's impacting all retailers." He added, "this is a real societal problem and we've got to lean together with the politicians to figure this out."

309.    On the March 20, 2024 earnings call for the fourth quarter of 2023, Defendants once again framed shrink as the primary driver of poor results. Defendant Anderson stated: "[d]espite these strong sales results, earnings per share of $3.65 was at the low end of our internal expectations and *can be fully attributed to higher-than-planned shrink*."

310.    Anderson further reminded investors that "shrink is industrywide and a societal problem that accelerated over the last year."

311.    The foregoing statements were materially false and misleading. By speaking about shrink as the cause of Five Below's disappointing results, Defendants assumed a duty to disclose material facts necessary to make those statements accurate and not misleading. Instead, Defendants misled investors by repeatedly suggesting shrink was the primary headwind, when in reality the Company was struggling to stock trend-right products and consistently failing to meet customer demand. Former employees confirmed that shrink was not the true source of declining sales. Rather, Five Below used shrink to misleadingly mask its inability to procure, stock, and track in-demand inventory.

312.    In addition, Defendants repeatedly and misleadingly equated "shrink" with theft. In truth, much of what Five Below recorded as shrink was not theft at all, but reflected the Company's deficient inventory tracking and control systems, as well as its failure to sell significant portions of its merchandise. By attributing these failures to external "societal" factors such as crime and lack

of prosecution, Defendants concealed the Company's internal operational deficiencies and materially misled investors.

**Defendants' False and Misleading Statements Regarding Shrink Mitigation**

313.    While Defendants publicly and misleadingly blamed the Company's struggles on the industry-wide issue of shrink, they also assured investors that Five Below was actively implementing mitigation efforts. These statements were designed to minimize investor concerns and reinforce the false impression that shrink, and not deeper operational problems, was the Company's primary obstacle, and that shrink was a controllable issue that management was addressing. In reality, Defendants used shrink as an excuse to conceal other significant, self-inflicted problems, including the Company's failed trend-right strategy and deficient inventory controls.

314.    Throughout the Relevant Period, Defendants repeatedly touted shrink mitigation measures, only later admitting on March 20, 2024 that such efforts had failed so badly that Five Below was abandoning its previously promoted self-checkout plans. For example, on the June 1, 2023 earnings call for the first quarter of 2023, Defendant Anderson stated, "*we are . . . doing things on our part to mitigate shrink,*" while Defendant Bull added, "*we're focusing on preventative measures around shrink.*"

315.    On the August 30, 2023 earnings call for the second quarter of 2023, Defendant Bull claimed: "*I am also leading a team to focus on operational mitigation efforts to counter the elevated shrink trends.*" He elaborated: "[W]e've dedicated a team to look at all different areas *to help with mitigation efforts. And that includes enhanced technology, merchandise presentation, . . . register formats, policies and procedures.*"

316.   On that same call, Defendant Anderson claimed mitigation efforts were already yielding results, asserting: "***We'd already mitigated some of the things from the 30 basis [point] increase from last year***. . . . The difference is . . . a year ago, we weren't doing anything about it. . . . ***So all the mitigation efforts we are putting in just started***." He further declared, "I see nothing but upside as we get past this shrink, ***put mitigation efforts in for that***."

317.   On November 30, 2023, during a Fox Business interview, Defendant Anderson again assured investors that mitigation efforts were underway, stating: "we're making some changes to our business model, we've had to really tighten up our selfcheckouts, we're putting some more labor in the stores. . . ***we will figure out the shrink and theft problem.***"

318.   On March 20, 2024, in a press release announcing fourth quarter 2023 results, Defendant Anderson claimed: ***"[w]e have implemented additional shrink mitigation initiatives based on our 2023 learnings."***

319.   These statements, coupled with Defendants' repeated emphasis on shrink as the key issue, were intended to calm investor concerns. By presenting shrink as both the root cause of financial underperformance and a problem management was actively solving through various mitigation efforts, Defendants created the false impression that the Company's struggles were temporary, external, and effectively being addressed.

320.   Defendants' mitigation statements lulled investors into a false sense of security, helping sustain the artificial inflation in Five Below's stock price that resulted from concealing its failed trend-right strategy and deficient inventory systems.

321.   The statements herein were materially false and misleading. Contrary to Defendants' representations about implementing "additional labor" and "policies and procedures," former employees confirmed that the Company's shrink mitigation efforts were minimal, ineffective, or

entirely illusory. On March 20, 2024, Defendants themselves admitted that guidance improperly incorporated expected benefits from shrink mitigation, those efforts had largely failed, and significant labor increases were now required.

322.    Former employees consistently corroborated that Five Below's shrink mitigation measures were ineffective. One former employee reported that employees and managers were contractually prohibited from intervening to prevent theft and were given no training or strategies to reduce shrink: Five Below "didn't do anything about shrink." Another confirmed the Company undertook minimal and sometimes counterproductive efforts, such as continuing to roll out self-checkout even after recognizing shrink as a problem. Yet another former employee recalled hearing of only one "shrink task force" and observed no implemented mitigation by his October 2023 departure. By March 2024, the Company admitted its mitigation had failed and acknowledged that meaningful reductions required higher labor spending.

323.    Defendants refused to incur costs associated with the investment necessary to make any difference to the amount of shrink the Company was experiencing. Despite repeatedly touting their supposed efforts, Defendants took no serious action to address the issue.

**Defendants' False and Misleading Statements regarding the Company's Triple-Double Plan**

324.    Defendants also made materially false and misleading statements and omissions concerning the outlook and success of the Company's ambitious "Triple-Double" plan, launched in March of 2022, which set forth goals to triple its store count by 2030 and double its sales and earnings by 2025.

325.    Throughout the Relevant Period, Defendants repeatedly touted the Company's progress under the plan, while omitting two material facts: (i) that the Triple-Double plan was

straining management's focus and undermining other critical business priorities; and (ii) that the Company would eventually be forced to scale back the pace of store openings.

326.    For example, on the November 30, 2022 earnings call for the third quarter of 2022, Defendant Anderson stated: "*[W]e're still on track for the long-term Triple-Double goals*. . . . *We are gaining momentum going into '23 and expect that to continue to grow*."

327.    On the March 15, 2023 earnings call for the fourth quarter of 2022, Defendant Bull stated: "[W]e plan to open 200 new stores [in 2023] and expect to end the year with 1,540 stores or unit growth of approximately 15%." Defendant Anderson added: "*[T]he process -- we streamlined it in several different ways to be able to execute more leases in a faster timeline more per month.* We are expanding the types of centers we're going into."

328.    On the June 1, 2023 earnings call for the first quarter of 2023, Defendant Anderson stated: "*[W]e now expect to reach a milestone of over 200 new stores this year, while building our pipeline for next year and beyond.*"

329.    On the August 30, 2023 earnings call for the second quarter of 2023, Defendant Bull stated: "*[We] feel extremely confident around the Triple-Double vision.*"

330.    On the November 29, 2023 earnings call for the third quarter of 2023, Defendant Anderson stated: "*We remain on track to achieve the goal of opening over 200 stores* [in 2023]. . . . Our real estate teams have built a strong pipeline of new stores for 2024 and have also started working on 2025 stores."

331.    At the January 8, 2024 ICR Conference, Defendant Anderson again promoted the Triple-Double plan, emphasizing the Company's intent to triple its stores by 2030 and acknowledging only a one-year delay in the goal of doubling sales, while omitting the significant strain the plan was placing on management bandwidth and internal operations. He stated:

Now I'd like to update you on the Triple-Double strategy. As you recall, we shared the strategy with you back in March of 2022, and it was very simple. We were going to triple our stores by 2030, we're going to double our earnings and sales by 2026 -- 2025. Today I will update you on exactly where that vision stands. . . . . . .

*As it relates to tripling our stores by 2030, I repeat, nothing has changed. We still . . . expect to triple our stores by 2030.* We opened 1,000 stores in the last seven years. We're going to open 2,000 stores in the next seven years.

. . . [D]oubling our sales is now pushed out by about one year to 2026. . . .

Defendant Anderson's remarks failed to disclose that the Triple-Double plan was distracting management and undermining the Company's "trend-right" strategy.

332.    On the March 20, 2024 earnings call for the fourth quarter of 2023, Defendant Anderson reiterated that the Company expected to open between 225 and 235 new stores in 2024. In response to an analyst's question about risks associated with the accelerated pace of openings, Defendant Anderson touted various technological and legal process improvements, while again omitting any discussion of the negative consequences associated with the rapid expansion:

[Q:] [H]ow do you avoid the mistakes with a more streamlined process when you're opening more stores than you did in the prior years, 225 to 235 is a lot of stores. So I don't want to see the bad ones, basically.

[A:] . . . We've been on the streamlined process for quite some time, everything from – we're using Placer AI now to help us evaluate stores, which allows us to do it quicker. The legal team has streamlined with some AI advantages, how quickly they're able to approve leases. All those add into -- add up to weeks not days. And so it's less about the approval at the rec committee level and it's more about the individual components that get it to the rec committee and then leases signed after the Rec committee. And this has been going on for a number of years with a extreme focus . . . .

333.    The following day, on March 21, 2024, Five Below filed its Form 10-K for the fiscal year ended February 3, 2024, which confirmed the plan to open between 225 and 235 new stores in fiscal 2024 and included historical data showing the accelerated pace of store openings in recent years:

| Year | Number of Stores at Start | Number of Stores at End | Number of New Stores | Percent Increase |
|---|---|---|---|---|
| FY 2021 | 1,020 | 1,190 | 170 | 17% |
| FY 2022 | 1,190 | 1,340 | 150 | 13% |
| FY 2023 | 1,340 | 1,544 | 204 | 15% |

334.    The Form 10-K omitted any disclosure that the Triple-Double plan was straining management's focus or that the Company was considering slowing the pace of new store openings.

335.    On the June 5, 2024 earnings call for the first quarter of 2024, Defendant Anderson emphasized store expansion as the Company's priority: "Our first pillar is store expansion. [We have] over 1,600 stores currently and a road map to 3,500 Five Below locations nationwide by the end of 2030. . . . *We are confident in our path to achieve approximately 230 new store openings this year and have already built a strong pipeline for 2025.*" He further assured investors that the Company's "*focus on executing our store growth plans with excellence is unwavering,*" while omitting that management was in fact considering reducing the pace of new store openings.

336.    At the June 12, 2024 Oppenheimer Conference, Defendant Anderson again stressed the Company's long-term growth narrative: "[I]t's also important we don't lose sight of the long term and the Five Below growth story and that remains solidly intact and there are several components to it. One, *it's all about a strong new store growth pipeline, which we reiterated several times on our [Q1 2024] call. It's about the Five Beyond expansion continuing . . . . [T]he long term growth of Five Below is something I am very excited about and we continue to pursue.*" He went on, "[w]hile we certainly didn't earn the right to put forth a guide for you that says immediate return to positive comps, there are certainly signs out there that this shouldn't be long term. *We certainly don't think it's structural at all or wouldn't be continuing our growth.*"

337.    Defendants' statements herein were materially false and misleading, and omitted material information necessary to render them not misleading. Having chosen to speak about the

Triple-Double expansion strategy, Defendants were obligated to do so accurately and completely. Yet they failed to disclose that the expansion plan was excessively aggressive, that new stores were chronically understaffed and under-stocked, and that the rapid expansion harmed existing store performance. As Defendants later admitted after the Relevant Period, the Triple-Double strategy was "too aggressive," imposed "tremendous" pressure on the organization, and diverted management's attention from other critical priorities, including the trend-right strategy. In response, the Company was ultimately forced to scale back its expansion.

338.    These admissions further illuminated the root causes of the trend-right and inventory management failures revealed in the corrective disclosures on June 5, 2024 and July 16, 2024.

339.    Former employees corroborate that the Company's expansion strategy was plagued by problems throughout the Relevant Period. One former employee, the Director of Fulfillment Center Operations, confirmed that employees had raised concerns about the plan as early as 2021, describing it as "way too aggressive." Others reported that new stores often opened without adequate inventory, leaving entire sections empty and requiring the Company to resort to stopgap measures such as transferring products from other stores or shipping outdated merchandise. A former Store Operator described the strategy as unrealistic given chronic understaffing. A former District Manager overseeing a dozen stores, explained that the opening of new stores not only strained operations but also cannibalized sales at nearby comparable stores.

340.    By concealing the adverse consequences of the Triple-Double expansion strategy, including its excessive aggressiveness, the operational strains it imposed, and the distraction it caused management, Defendants misled investors regarding the sustainability of Five Below's growth and its ability to execute its core business strategies. These omissions and misstatements

maintained the artificial inflation in the Company's stock price during the Relevant Period and prevented investors from appreciating the true risks associated with the Company's expansion plan.

## INSIDER SALES

341.    Defendants Anderson, Bull, Barclay, Buggeln, Sargent, and Vellios ("Insider Selling Defendants) took advantage of the artificially inflated market price of Five Below's common stock by disposing of substantial amounts of their personal holdings during the Relevant Period . While in possession of material, adverse, and non-public information, the Insider Selling Defendants collectively sold over 140,000 shares, generating more than $27 million in proceeds. The magnitude and timing of these transactions were highly suspect, and are indicative of opportunistic conduct inconsistent with routine trading activity.

342.    Between December 2, 2022 and March 21, 2024, Defendant Anderson sold 37,861 shares for proceeds of $7,532,106.

343.    Between December 2, 2022 and March 21, 2024, Defendant Bull sold 8,442 shares for proceeds of $1,547,113.

344.    Between December 2, 2022 and March 30, 2023, Defendant Barclay sold 5,819 shares for proceeds of $1,126,935.

345.    On December 2, 2022, Defendant Buggeln sold 2,253 shares for proceeds of $491,240.

346.    Between April 4, 2023 and June 7, 2023, Defendant Sargent sold 10,055 shares for proceeds of $2,074,036.

347.    Between December 2, 2022 and January 23, 2024, Defendant Vellios sold 80,000 shares for proceeds of $15,334,277.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS' WRONGFUL CONDUCT

348.   The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

349.   The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

350.   The Individual Defendants breached their fiduciary duties to Five Below because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants made false statements and/or failed to disclose critical information about: (1) the Company's ability to identify trending product, and then allocate and track those "trend-right" products in order to successfully provide sufficient volume to meet and drive customer demand; (2) its plans to successfully triple its number of stores by 2030 while doubling its sales by 2025 (its "Triple-Double" initiative); and (3) the resulting decline in its sales and margins, which it instead misleadingly blamed on "shrink" – or shoplifting and theft.

## DAMAGES TO FIVE BELOW

351.   As a direct and proximate result of the Individual Defendants' conduct, Five Below will lose and expend many millions of dollars.

352.   Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal

investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

353. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

354. As a direct and proximate result of the Director Defendants' conduct, Five Below has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

355. Plaintiff brings this action derivatively for the benefit of Five Below to redress injuries suffered and to be suffered as a proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

356. Plaintiff will adequately and fairly represent the interests of Five Below and its stockholders in enforcing and prosecuting its rights.

357. Plaintiff has been a continuous holder of Five Below common stock since January 2022.

358. On June 20, 2025, Plaintiff, acting through counsel, sent a demand ("Demand") to the Board, asserting that it investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors.

359. On September 17, 2025, Counsel for SLC informed Plaintiff's counsel by email that "[t]he SLC has completed its investigation and has determined that it would not be in the best interests of the Company to pursue litigation or take other steps in response to the demand letters."

As such, Plaintiff has not received a substantive response to the Demand and demand in this case was refused.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

360.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

361.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Five Below's business and affairs.

362.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Five Below.

363.    In breach of their fiduciary duties owed to Five Below, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

364.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Five Below's securities.

365.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Five Below's securities.

366.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

367.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Five Below has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

368.    Plaintiff on behalf of Five Below has no adequate remedy at law.

## COUNT II

### Violations of Section 14(a) of the Exchange Act
### Against the Director Defendants

369.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

370.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or

instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

371.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

372.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Proxy Statements filed with the SEC on May 3, 2023 and May 2, 2024 (collectively, the "Proxies"). Specifically, the Proxies contained false statements and/or failed to disclose critical information about: (1) the Company's ability to identify trending product, and then allocate and track those "trend-right" products in order to successfully provide sufficient volume to meet and drive customer demand; (2) its plans to successfully triple its number of stores by 2030 while doubling its sales by 2025 (its "Triple-Double" initiative); and (3) the resulting decline in its sales and margins, which it instead misleadingly blamed on "shrink" – or shoplifting and theft.

373.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

374.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

375.    Plaintiff has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

376.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

377.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Five Below.

378.    Each of the Defendants received payment from Five Below, in the form of either salary or director fees, while actively breaching their fiduciary duties to Five Below.

379.    All the payments and benefits provided to Defendants were at the expense of FIVE BELOW. The Company received no benefit from these payments.

380.    Plaintiff, as a shareholder and a representative of Five Below, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of Five Below has no adequate remedy at law.

## COUNT IV

### Against the Insider Selling Defendants for Breach
### of Fiduciary Duties for Insider Trading and Misappropriation of Information

381.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully stated herein.

382.    The Insider Selling Defendants, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had

yet to be released to the investing public. These Defendants participated in the scheme to keep the public unaware of the detriment of the investing public and the Company itself.

383.    This proprietary, non-public information concerning the Company's business and prospects was known by Insider Selling Defendants who sold large quantities of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of Five Below and the investing public.

384.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

385.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Five Below.

## COUNT V

### Against Individual Defendants for Waste of Corporate Assets

386.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

387.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Five Below to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

388.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

389.    Plaintiff on behalf of Five Below has no adequate remedy at law.

## <u>REQUEST FOR RELIEF</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)      Declaring that the Plaintiff may maintain this action on behalf of Five Below, and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached their fiduciary duties to Five Below;

c)      Determining and awarding to Five Below the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Five Below's corporate governance and internal procedures to comply with applicable laws and to protect Five Below and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for more significant shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of Five Below to nominate at least four candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e)    Awarding  Five Below restitution from Individual Defendants, and each of them;

f)    Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 2, 2025

**OF COUNSEL:**

**KUEHN LAW**
Justin A. Kuehn
Molly J. Brown
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law
molly@kuehn.law

**RIGRODSKY LAW, P.A.**

/s/ *Gina M. Serra*
Gina M. Serra
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
gms@rl-legal.com

Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
vl@rl-legal.com

*Attorneys for Plaintiff*